751 F.2d 906
 Blue Sky L. Rep. P 72,133, Fed. Sec. L. Rep. P 91,854
CARDIFF ACQUISITIONS, INC. and Cardiff Equities Corporation,
Appellants,
v.
Michael A. HATCH, Commissioner of Commerce of the State of
Minnesota, Hubert H. Humphrey, III, Attorney
General of the State of Minnesota, and Conwed Corporation, Appellees.
 No. 84-5210.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 20, 1984.
Decided Nov. 29, 1984.
Rehearing and Rehearing En Banc Denied Jan. 24, 1985.
 
 Dennis J. Block, New York City, argued, Jerome B. Simon, St. Paul, Minn. for appellants.
 Gregory P.N. Joseph, New York City, Robert E. Woods, Briggs and Morgan, St. Paul, Minn., for Conwed Corp.
 Alan Gilbert, Sp. Asst. Atty. Gen., St. Paul, Minn., for Hatch and Humphrey.
 Dean Erwin N. Grisold, Washington, D.C., amicus curiae Minnesota Wellspring.
 Before LAY, Chief Judge, and HEANEY and FAGG, Circuit Judges.
 HEANEY, Circuit Judge.
 
 
 1
 Cardiff Acquisitions, Inc., and Cardiff Equities Corporation (Cardiff) appeal from a district court order dismissing Cardiff's complaint requesting preliminary and permanent injunctive relief preventing the Commissioner of Commerce, the Attorney General, and the Conwed Corporation from enforcing the Minnesota Corporate Take-Overs Act, 1984 Minn.Laws ch. 488, to be codified as Minn.Stat.Ann. chs. 80B and 302A. The district court held that the Act does not violate either the commerce or the supremacy clause of the United States Constitution. It reasoned that the Minnesota Take-Overs Act does not directly regulate interstate commerce, because "its scope is limited to Minnesota shareholders of companies that have a substantial nexus with the state [and] Minnesota claims no right under the statute to suspend the effect of a tender offer with regard to shareholders outside of Minnesota." Cardiff Acquisitions, Inc. v. Hatch, 597 F.Supp. 1493, at 1497 (D.Minn.1984).
 
 
 2
 The district court recognized that the statute has indirect effects on interstate commerce, but it determined that these effects were outweighed by the state's legitimate interest in protecting local investors. Id. at 1497-1498.
 
 
 3
 The district court also held that the take-over statute does not violate the supremacy clause of the United States Constitution. It reasoned that Section 28(a) of the Securities Exchange Act of 1934 specifically permits states to enact tender offer legislation consistent with the Williams Act, 15 U.S.C. Secs. 78m(d)-(e) and 78n(d)-(f) (1982). It stated:
 
 
 4
 The Minnesota Act is consistent with the purposes of the Williams Act. The Minnesota Act is essentially a disclosure statute that requires disclosure parallel to that in the Williams Act. The purpose of the disclosure requirements under both acts is shareholder protection. The principal additional disclosure required under the Minnesota Act (the effect that a take-over will have on the state) is not in any way inconsistent to the purpose of the disclosure requirements under federal law and serves to protect the unique interests of Minnesota shareholders. This court does not believe that the additional disclosure required by the Minnesota Act will result in the shareholders receiving a mass of irrelevant information that will serve to confuse rather than enlighten. * * *
 
 
 5
 * * *
 
 
 6
 * * *
 
 
 7
 In conclusion, while there may exist some conflicts between the provisions of the Williams Act and the Minnesota Take-Overs Act, the Supreme Court instructs that the "... proper approach is to reconcile the operation of both statutory schemes with one another rather than holding one completely ousted." Merrill Lynch, Pierce, Fenner & Smith v. Ware, 414 U.S. 117, 127 [94 S.Ct. 383, 389, 38 L.Ed.2d 348] (1973). That can clearly be done in this case. The Minnesota Act does not sufficiently conflict with the Williams Act so as to make compliance with both impossible or to frustrate the purposes of it. This court therefore holds that the Minnesota Corporate Take-Overs Statute does not violate the supremacy clause.
 
 
 8
 Cardiff Acquisitions, Inc. v. Hatch, 597 F.Supp. 1493, at 1498-1499, 1500 (D.Minn.1984) (citation omitted).
 
 
 9
 We affirm in part the district court's decision that the Minnesota Act is not facially unconstitutional because we believe the Act may be narrowly construed in a manner which 1) is substantially consistent with the Williams Act; 2) is not unduly burdensome to interstate commerce; and 3) serves the state's legitimate interest in protecting local investors. We agree that Minnesota may require disclosures in addition to those required under the Williams Act before a tender offer becomes effective within the state so long as the disclosures are purely factual and not judgmental in nature, are not inconsistent with the Williams Act and are not unduly burdensome to interstate commerce. Applying these tests, we approve, in part, the additional disclosures required by the Commissioner.
 
 
 10
 I. FACIAL CONSTITUTIONALITY OF MINNESOTA TAKE-OVERS ACT.
 
 
 11
 A. Commerce Clause.
 
 
 12
 In Edgar v. MITE Corp., 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), the Supreme Court held that the Illinois Business Takeover Act, Ill.Rev.Stat. ch. 121 1/2 p 137.51-.70 (1979), is unconstitutional under the commerce clause of the federal Constitution, Art. I, Sec. 8, cl. 3. Justice White's five-part opinion considered MITE's challenges to the Illinois Act under the supremacy clause and direct and indirect commerce clause tests, but a majority only adopted Part V-B.[1] Part V-B holds that the Illinois Act violates the commerce clause under the accepted standard set forth in Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970), because the indirect burdens on interstate commerce were excessive in relation to the putative local benefits. Justice White's opinion indicated that several provisions of the Illinois Act were particularly burdensome to interstate commerce; Part V-B, however, relied principally on the provisions of the Act which authorized the Secretary of State to suspend a tender offer even where none of the target corporation's shareholders were Illinois residents:
 
 
 13
 While protecting local investors is plainly a legitimate state objective, the State has no legitimate interest in protecting nonresident shareholders. Insofar as the Illinois law burdens out-of-state transactions, there is nothing to be weighed in the balance to sustain the law.
 
 
 14
 Id., 457 U.S., at 644, 102 S.Ct. at 2642.
 
 
 15
 Justice Powell provided the vote necessary to obtain a majority with the reservation, "I join Part V-B because its Commerce Clause reasoning leaves some room for state regulation of tender offers." Id., 457 U.S. at 646, 102 S.Ct. at 2643.
 
 
 16
 The Minnesota Act is materially different in scope and application from the Illinois Act at issue in MITE. The Minnesota Act was revised in 1984, in light of MITE and its progeny, to reduce its burden on interstate commerce and to tighten its relation to the state's legitimate interest in protecting resident investors. MITE is distinguishable because none of the provisions of the Illinois Act[2] which the Court indicated were significant burdens on interstate commerce are present in the Minnesota Act.
 
 
 17
 1. Under the Illinois Act, a tender offeror must notify the Secretary of State and the target company of its intent to make a tender offer and the material terms of the offer twenty business days before the offer becomes effective. Ill.Rev.Stat., ch. 121- 1/2, p 137.54.E (1979). During that time, the offeror may not communicate its offer to the shareholder. Meanwhile, the target company is free to disseminate information to its shareholders concerning the pending offer.
 
 
 18
 By contrast, the Minnesota Act does not provide for a precommencement filing period, and provides that the target corporation may not disseminate information to or solicit shares from its Minnesota shareholders while the offer is suspended in Minnesota. 1984 Minn.Sess.Law Serv., ch. 488, Sec. 80B.05(4) (West).
 
 
 19
 2. The Illinois Act permitted the Secretary of State to convene a hearing regarding the tender offer at any time prior to its commencement and provided that the offer could not proceed until the hearing is completed. Ill.Rev.Stat., ch. 121- 1/2, p 137.57.A and B (1979). The Illinois Act required the Secretary of State to call a hearing if requested to do so by a majority of the target company's outside directors or by Illinois shareholders who own at least ten percent of the class of securities subject to the offer. p 137.57.A. This provided target management with a delay period, requestable at will, during which it could oppose the takeover or mount its own tender offer. Additionally, there is no deadline for completion of the hearing and although the Secretary is required to render a decision within fifteen days, that period may be extended without limitation. p 137.57.C and D.
 
 
 20
 The Minnesota Act contains no similar provisions. An offer becomes effective when the offeror files with the commissioner a registration statement disclosing the information prescribed in section 80B.03(2) & (6).[3] The Commissioner may suspend the tender offer in Minnesota within three days if the registration materials fail to apprise local investors fairly of the information required by 80B.03(2) & (6). 1984 Minn.Sess.Law Serv., ch. 488, Sec. 80B.03(4a) (West). The suspension may be lifted once the offeror discloses the information specified in section 80B.03(2) & (6). A hearing on the suspension must be convened within ten days and a decision rendered within three days. 1984 Minn.Sess.Law Serv., ch. 488, Sec. 80B.03(5) (West). The Minnesota Act does not contain a provision like the one in the Illinois Act which required the Commissioner to convene a hearing at the request of the target corporation. In sum, there is no delay under the Minnesota Act as there was under the Illinois Act because the Commissioner must complete the process within nineteen calendar days, 1984 Minn.Sess.Law Serv., ch. 488, Sec. 80B.03(5) (West), which is prior to the expiration of the twenty business -day minimum offering period specified by federal law and the fifteen business -day period for withdrawal rights. 17 C.F.R. Secs. 240.14d-7 and 240.14e-1 (1984).
 
 
 21
 Cardiff argues that hearings on the suspension of the offer may be unreasonably delayed because section 80B.03(5) provides that the "commissioner may prescribe different time limits than those specified in this subdivision by rule or order." The Commissioner has not done so, however, and in this case and in Edudata Corp. v. Scientific Computers, Inc., 746 F.2d 429 (8th Cir.1984)--the only other case in which chapter 80B has been applied--the Commissioner has offered to advance the hearing date. Section 80B.03(5) does not specify that the deadlines may be extended, rather it says that different time periods may be provided. This might contemplate expedited hearings as the Commissioner offered here and in Edudata. In this case, review in this Court will be completed within or shortly after the twenty business day deadline under the Williams Act. Additionally, in this case, the Commissioner construed section 80B.05(4) to allow Conwed to mail the Cardiff offering materials to its Minnesota shareholders pending the hearing before the Commissioner. In light of this experience, we have no reason to believe the Minnesota Act will be applied in a manner which creates burdensome delay.
 
 
 22
 3. Under section 137.57.E of the Illinois law, the Secretary is required to deny registration of a takeover offer if he finds that the takeover offer is inequitable. There is no similar provision in the Minnesota Act.
 
 
 23
 4. The Illinois Act applies whenever ten percent of the target corporation's outstanding shares are held by Illinois residents, MITE, 457 U.S. at 637, 102 S.Ct. at 2638, or when the target corporation meets any two of the following conditions: (1) its principal executive office is in Illinois; (2) it is organized under the laws of Illinois; or (3) it has at least ten percent of its stated capital and paid-in-surplus represented in Illinois. Ill.Rev.Stat., ch. 121- 1/2, p 137.52-10(2) (1979). In MITE, Justice White emphasized that the Illinois Act regulated offers from an out-of-state tender offeror to an out-of-state shareholder. The Act could apply even if none of the target's shareholders were Illinois residents.
 
 
 24
 By contrast, the Minnesota statute applies only when at least twenty percent of the target's shareholders are Minnesota residents and the target has "substantial assets" in the state.[4] 1984 Minn.Sess.Law Serv., ch. 488, Sec. 80B.01(9) (West). Any suspension applies only to Minnesota residents. Thus, the Pike test leads to different results in this case than it did in MITE. In that case, Justice White held that, to the extent the Illinois Act applied even when none of the target corporation's shareholders were Illinois residents, there were no legitimate local interests to be weighed against the effects on interstate commerce. Under the Minnesota Act, however, interstate commerce is indirectly burdened only when the target company has substantial numbers of Minnesota shareholders. Thus, MITE is distinguishable.
 
 
 25
 Cardiff, however, argues that even though the Minnesota Act is not as burdensome as the Illinois Act at issue in MITE, it still violates the commerce clause because its indirect burdens on interstate commerce are excessive in relation to the putative local benefits. Cardiff points out that the Minnesota Act burdens interstate commerce because it imposes disclosure requirements beyond those of the Williams Act, because the existence, enforcement and cost of complying with the Act burden interstate commerce and because a suspension in Minnesota may discredit the tender offer nationwide. It also argues that the asserted protections to local investors are illusory because most of the disclosures required by the Minnesota Act are already required by the Williams Act, and the additional disclosures serve no valid purpose.
 
 
 26
 We join the district court in rejecting these arguments. First, the benefits to local investors are not illusory. Although the disclosure requirements of 1984 Minn.Sess.Law Serv., ch. 488, Sec. 80B.03(2) & (6) largely parallel those set forth in the Williams Act,[5] simultaneous enforcement of the requirements imposes little burden on offerors but ensures protection of local investors. This is particularly true in view of the fact that the SEC apparently lacks the resources to police the thousands of schedule 13(d) reports and amendments filed each year.[6] The state, on the other hand, apparently has the resources to carefully examine the reports to ensure that they in fact disclose the information required by the state statute and regulations.
 
 
 27
 We also agree with the district court that the additional disclosures required by the Minnesota Act will aid Minnesota shareholders in appraising the value of a tender offer and will not result in the shareholders receiving a mass of irrelevant information that will serve to confuse rather than enlighten. The additional disclosures are primarily concerned with the impacts of the proposed takeover on Minnesota residents, including employees and suppliers. While the state may not use the statute as a protectionist measure, it may require the offeror to inform Minnesota stockholders as to the impacts on the state or its residents of the takeover, so that they can consider these factors as an element in their decision to retain their stock or to sell it.
 
 
 28
 B. Supremacy Clause.
 
 
 29
 We now turn to Cardiff's claim that the district court erroneously held that the Minnesota Act is consistent with the purposes of the Williams Act and thus is not facially invalid under the supremacy clause of the federal Constitution.
 
 
 30
 1. The Legal Standard.
 
 
 31
 When Congress added the Williams Act, 15 U.S.C. Secs. 78m(d)-(e) and 78n(d)-(f) to the Securities Exchange Act of 1934, it refused to amend section 28(a) of the 1934 Act, 15 U.S.C. Sec. 78bb(a) (1982). In pertinent part, section 28(a) provides that
 
 
 32
 [n]othing in this chapter shall affect the jurisdiction of the securities commission (or any agency or officer performing like functions) of any State over any security or any person insofar as it does not conflict with the provisions of this chapter or the rules and regulations thereunder.
 
 
 33
 Thus, Congress did not explicitly or impliedly bar states from regulating tender offers. National City Lines, 687 F.2d at 1129. It left to the courts the determination whether a state act conflicts with the Williams Act. MITE, 457 U.S. at 631, 102 S.Ct. at 2635 (plurality opinion).
 
 
 34
 In MITE, Justice White, joined by Chief Justice Burger and Justice Blackmun, reasoned that three provisions of the Illinois Takeover Act violated the supremacy clause of the federal Constitution because they conflicted with the secondary purpose of the Williams Act to maintain a balance of neutrality between a tender offeror and the management of the target corporation. (The primary purpose of the Act is to protect investors.) Justices Powell and Stevens disagreed. Justice Powell wrote:
 
 
 35
 I agree with Justice Stevens that the Williams Act's neutrality policy does not necessarily imply a congressional intent to prohibit state legislation designed to assure--at least in some circumstances--greater protection to interests that include but often are broader than those of incumbent management.
 
 
 36
 Id., 457 U.S. at 646-47, 102 S.Ct. at 2643.
 
 
 37
 Because the remaining four justices did not reach the issue, the Court has not definitively resolved whether the view of Justices Powell and Stevens, the view of Justices White, Burger and Blackmun, or some other analysis should apply.
 
 
 38
 In National City Lines v. LLC Corp., 687 F.2d 1122 (8th Cir.1982), this Court held that certain provisions of the Missouri Takeover Bid Disclosure Act, Mo.Rev.Stat. 409.500 et seq. (1979), as applied to National, were unconstitutional under the supremacy and commerce clauses of the federal Constitution. We stated that there were no significant distinctions between the Illinois Act and the Missouri Act, and that, therefore, the issues raised under the commerce clause were controlled by the majority decision in MITE. 687 F.2d at 1128. We also held that the provisions of the Missouri Act relating to timetables, disclosure requirements, and substantive requirements--which were substantially identical to similar provisions of the Illinois Act were preempted--because they were "incompatible" with the Williams Act. Id. We now turn to Cardiff's specific arguments that certain sections or aspects of the Minnesota law are incompatible with the Williams Act.
 
 
 39
 2. Cardiff's Arguments.
 
 
 40
 Cardiff argues that certain provisions of the Minnesota Act are invalid under the supremacy clause analysis adopted in National City Lines. Initially, it asserts that the Minnesota Act conflicts with the Williams Act because it empowers the Commissioner to review the adequacy of disclosures and to stop the tender offer if he determines that there has not been "full disclosure * * * of all material information" or of "other information which would affect the shareholders' evaluation of the acquisition." 1984 Minn.Sess.Law Serv., ch. 488, Sec. 80B.03(4a) (West). See also id. Sec. 80B.03(6)(c) (West). Cardiff contends that these provisions are contrary to the teachings of National City Lines, 687 F.2d at 1132-33, because they allow the Commissioner to "second guess" the judgment of the Securities and Exchange Commission as to "what data is material to aid an investor considering a tender offer."
 
 
 41
 We join the district court in rejecting this argument. The disclosure requirements of the Missouri statutes considered in National City Lines were much broader and more open-ended than those of the Minnesota statute. In addition to a number of disclosure provisions not found in federal law, Mo.Rev.Stat. Sec. 409.515 (1979) required disclosure of "such additional information as the Commissioner may require as necessary in the public interest or for the protection of investors." National City Lines, 687 F.2d at 1131. We noted that this open-ended provision could likely require disclosure of a "mass of irrelevant data" which could confuse rather than enlighten investors. Id.
 
 
 42
 We agree with the district court, for the reasons stated at pages 911-12, that the principal additional disclosure required by the Minnesota Act (the effect that a takeover will have on the target company's operations, its employees, suppliers and customers, and the communities in which it operates, see 1984 Minn.Sess.Law Serv., ch. 488, Sec. 80B.03(6)(c) (West)), is not inconsistent with the Williams Act and serves to protect unique and legitimate interests of Minnesota shareholders. We agree with Cardiff, however, that the clause in section 80B.03(2) which authorizes the Commissioner to require "such additional information as the commissioner by rule prescribes" is unconstitutional. We also agree that a similar clause in section 80B.03(6) which also requires the offeror to disclose such "additional information the commissioner may by rule prescribe" is unconstitutional. These open-ended provisions are similar to the clause in Mo.Rev.Stat. Sec. 409.515 (1979) which we found to be unconstitutional in National City Lines, 687 F.2d at 1131. These sections are unconstitutionally vague and may require the disclosure of irrelevant or confusing data and may require judgmental data that the Commissioner has no authority to require. We believe, however, that it is constitutional for the Commissioner to require disclosure of all the other factual matters set forth in 1984 Minn.Sess.Law Serv., ch. 488, Sec. 80B.03(2) & (6), including those closely related factual matters which must be disclosed so that shareholders can adequately evaluate the information which these sections require to be disclosed.
 
 
 43
 Next, we believe that it is constitutionally permissible for the Commissioner to review the adequacy of the disclosures required by 1984 Minn.Sess.Law Serv., ch. 488, Sec. 80B.03(2) & (6)(a)-(e) so long as he restricts himself to deciding whether sufficient facts have been disclosed to comply with the specific disclosures required by these sections. The Commissioner has no authority to suspend the effectiveness of a tender offer on the ground that the quality of the facts alleged do not satisfy him. He may not require evaluative, judgmental, or overly burdensome or irrelevant disclosures, and he may not pass on the fairness of the offer as disclosed.
 
 
 44
 Cardiff also challenges the constitutionality of section 80B.06(7) of the Minnesota Act, which provides that Minnesota residents who do not tender shares may later demand "a reasonable opportunity to dispose of the securities to the offeror upon substantially equivalent terms as provided in the earlier takeover offer." The district court did not address the validity of this provision. We also express no view on its validity because we agree with the State that Cardiff's constitutional challenge to the price protection provision does not present this Court with a case or controversy ripe for judicial resolution.
 
 
 45
 Because we find that the Act is, with a few exceptions, constitutional on its face, we must also analyze whether the Act is constitutional as applied by the Commissioner. The Commissioner's order was divided into four sections. We analyze each section in turn.
 
 
 46
 II. CONSTITUTIONALITY OF THE MINNESOTA TAKE-OVERS ACT AS APPLIED.
 
 
 47
 A. Sources of Financing and Future Plans.
 
 
 48
 Subsection (b) of 1984 Minn.Sess.Law Serv., ch. 488, Sec. 80B.03(6) requires the disclosure of
 
 
 49
 the source and amount of funds or other consideration used or to be used in acquiring any equity security, including, if applicable, a statement describing any securities which are being offered in exchange for the equity securities of the issuer, and if any part of the acquisition price is or will be represented by borrowed funds or other consideration, a description of the material terms of any financing arrangements and the names of the parties from whom the funds were borrowed[.]
 
 
 50
 The Commissioner determined that Cardiff failed to disclose with adequate specificity the source of its financing. We agree. While the Commissioner does not have the authority to decide whether the financing plan is fair, he can require that financing statements be sufficiently comprehensive so that stockholders can determine for themselves whether they should exercise their right to retain their stock or to sell it.
 
 
 51
 It is apparent from the record that Cardiff Acquisitions is a shell corporation without assets. It is the wholly owned subsidiary of Cardiff Equities which has a net worth of only $5 million. (The purchase price for the stock is estimated to be approximately $30.5 million.) The disclosure filing states that Leucadia National Corporation (a corporation which controls Cardiff) has agreed to advance Cardiff funds to effect the purchase agreement, but no written agreement exists and the terms of the oral agreement, if one in fact exists, have not been spelled out. The filing goes on to state that Cardiff is negotiating with several banks concerning a revolving line of credit but indicates that no bank has as yet made a commitment. It then states:
 
 
 52
 As indicated above, Cardiff expects to become significantly more leveraged as a result of the Offer. Although Cardiff has not made any definitive determination as to the source of funds for repayment of its indebtedness to National (or to the banks referred to above if Cardiff's discussions culminate in an agreement and the indebtedness to National is refinanced), it is anticipated that such indebtedness will be repaid from the cash flow resulting from profits net of depreciation and capital expenditures of Cardiff and, if a business combination with the Company is consummated, of the Company and from the proceeds of any dispositions of assets or businesses of the Company as discussed in Section 10. In addition, Cardiff believes that it has access to sources of long-term financing that could be used for repayment of indebtedness incurred in connection with the Offer.
 
 
 53
 On the basis of this and other information in the report, the Commissioner held that no present stockholders of Conwed could possibly make an informed decision as to whether to retain or sell their stock. We agree. No stockholder could know from the disclosure the terms and conditions under which National would advance the money necessary to make the purchase to Cardiff, nor could he know for sure that the funds would be available at all.
 
 
 54
 We agree with the Commissioner that if Cardiff has an agreement with National to advance Cardiff funds to affect the purchase agreement, Conwed's Minnesota shareholders must be informed of the terms of this agreement. On the other hand, if Cardiff does not have an agreement with National, it should clearly say so.
 
 
 55
 Subsection (c) of section 80B.03(6) requires the disclosure of the offeror's plans, if any, for the target corporation if acquired, including "any plans or proposals * * * to liquidate the issuer [and] sell its assets * * *." The Commissioner noted that, in light of the financial statements of Conwed and Cardiff, it is likely that Cardiff will liquidate a substantial portion of Conwed's assets if the takeover is successful. While we believe it is improper for the Commissioner to characterize what Cardiff might do if it acquires Conwed, we agree that if Cardiff has plans to liquidate Conwed, it must disclose these plans.
 
 
 56
 B. Exposure to Lawsuits.
 
 
 57
 Subsection (c) of section 80B.03(2) requires a corporation to disclose, among other listed information, "any material pending legal or administrative proceedings in which the offeror or any of the subsidiaries is a party * * *." The Commissioner noted that
 
 
 58
 With regard to the various lawsuits against the parent companies, and the apparent use of their funds to finance the purchase of Conwed, the materials should disclose whether any liability or "trust" arrangement could be imposed on Conwed's assets.
 
 
 59
 This request is improper because it goes beyond a request for disclosure of facts and requests Cardiff to characterize and evaluate potential lawsuits or legal claims in pending suits which might be asserted in the future. Subsection (c) of section 80B.03(2) only requires a corporation to state the facts fully regarding pending lawsuits. Additionally, the Minnesota Act does not give the Commissioner authority to require offerors to evaluate the facts which they have disclosed.
 
 
 60
 C. Actions of Controlling Persons Vis-a-Vis Rights of Minority Shareholders.
 
 
 61
 In this section, Part B, the Commissioner determined that Cardiff's disclosure filing failed to address adequately a variety of lawsuits and corporate transactions relating to actions of controlling persons vis-a-vis rights of minority shareholders. The Commissioner requested Cardiff to discuss the "value and propriety" of these transactions and events. We believe the Minnesota Act does not authorize the Commissioner to request this information. Cardiff may be required to disclose the facts concerning pending lawsuits, but it need not evaluate these facts or discuss the "value and propriety" of its transactions. These evaluative determinations are to be made by Conwed's shareholders, not by the Commissioner or by Cardiff.
 
 
 62
 D. Two-Tier Offer.
 
 
 63
 Minn.Stat. Sec. 80B.06, subd. 7, provides in part:
 
 
 64
 No offeror may acquire from any resident of this state in any manner any equity securities of any class of a target company at any time within two years following the last purchase of securities pursuant to a take-over offer with respect to that class * * * unless the holders of the equity securities are afforded, at the time of the acquisition, a reasonable opportunity to dispose of the securities to the offeror upon substantially equivalent terms as those provided in the earlier take-over offer.
 
 
 65
 We previously noted that this provision may not be applied to Cardiff until several factual predicates arise and that, accordingly, Cardiff's constitutional challenge to this provision is not a ripe case or controversy which we may decide on this expedited appeal.
 
 
 66
 Cardiff's tender offer filing states that a second-tier offer might not comply with the above provision. The Commissioner's order, Part A, required Cardiff to disclose that its potential two-tier offer would not comply with the above prohibition on two-tier offers. We find the Minnesota Act does not authorize the Commissioner to request that Cardiff include such a statement in its disclosure filing. The Commissioner's order requires Cardiff to evaluate what might happen if, at some point in the future, it makes a two-tier offer in violation of a new statutory section which might be unconstitutional. The statute provides other and better methods to deal with Cardiff's potential two-tier offer proposal. First, if section 80B.06(7) is constitutional, Cardiff will be prevented from making a two-tier proposal when and if it decides to try to do so. Second, Cardiff's statement might be a fraudulent and deceptive practice under Minn.Stat. Sec. 80B.05. If so, adequate remedy for Cardiff's two-tier offer claim is available.
 
 
 67
 Affirmed in part, reversed in part, and remanded to the district court for further proceedings consistent with the opinion. Each party to this appeal shall bear its own costs.
 
 
 
 [1]
 Parts I and II state the facts and dispose of a mootness claim. Parts III and IV reason that the Illinois Act violates the supremacy clause because it is substantially inconsistent with the Williams Act. Three justices concurred in that analysis, two disagreed with it, and four did not reach the issue. Part V-A reasoned that the Illinois Act was unconstitutional as a direct regulation of interstate commerce. Four justices concurred in that analysis. Five justices agreed only on Part V-B, discussed above; with Parts I and II, it forms the opinion of the Court
 
 
 [2]
 The commerce clause holding in National City Lines v. LLC Corp., 687 F.2d 1122, 1128 (8th Cir.1982), is also distinguishable on this basis because our holding was based on the lack of any significant distinctions between the Illinois Act considered in MITE and the Missouri Act at issue
 
 
 [3]
 This scheme is substantially similar to that set forth in SEC regulations promulgated in 1980. Regulation 14d-2(b), 17 C.F.R. Sec. 240.14d-2(b) (1984), requires that an offeror make its offer effective by disseminating specified information to shareholders and filing appropriate documents with the SEC within five days of its commencement or else withdraw it. This provision postdated the MITE tender offer and was not considered by the Court. 457 U.S. at 636 n. 11, 102 S.Ct. at 2638 n. 11
 
 
 [4]
 Although the precise meaning of "substantial assets" is unclear, the Commissioner has only applied the statute to target corporations which have their primary places of business in Minnesota. In this case, almost three-fourths of Conwed's employees, most of its manufacturing facilities, all of its research and testing centers, and the beneficial holders of more than twenty percent of its stock reside in Minnesota. Cardiff Acquisitions, Inc. v. Hatch, 597 F.Supp. 1493 at 1495 (D.Minn.1984); Hill Aff. paragraphs 3-8
 
 
 [5]
 The Minnesota Act's disclosure requirements are set forth in section 80B.03(2) and (6). Section 80B.03(2)(c) requires an offeror which is not a natural person to disclose
 information concerning its organization and operations, including the year, form and jurisdiction of its organization, a description of each class of equity security and long term debt, a description of the business conducted by the offeror and its subsidiaries and any material changes therein during the past three years, a description of the location and character of the principal properties of the offeror and its subsidiaries, a description of any material pending legal or administrative proceedings in which the offeror or any of its subsidiaries is a party, the names of all directors and executive officers of the offeror and their material business activities and affiliations during the past three years, and financial statements of the offeror in such form and for such period of time as the commissioner may by rule prescribe[.]
 Under section 80B.03(6)(a)-(e), an offeror must disclose: (a) information about its background and identity; (b) the source of the funds to be used in making the purchase and the material terms of any financing arrangements; (c) the purpose of the purchase and the offeror's plans for the business, including any plans to liquidate the company, to make major changes in its corporate structure or to materially alter its relationship with suppliers, customers, or communities in which it operates; (d) the extent of the offeror's holdings in the target company; and (e) the material terms of any contract, arrangement, or understanding with any other person with respect to the equity securities of the issuer whereby the person filing the statement has or will acquire any interest in additional equity securities of the issuer, or is or will be obligated to transfer any interest in the equity securities to another.
 Similarly, under the Williams Act and SEC regulations, 15 U.S.C. Sec. 78m(d)(1), 17 C.F.R. Sec. 240.13d-1 (1984), an offeror must disclose information about its background and identity, the source of the funds to be used in making the purchase, the purpose of the purchase, including any plans to liquidate the company or make major changes in its corporate structure, and the extent of the offeror's holdings in the target company.
 
 
 [6]
 Cf. Gearhart Industries, Inc. v. Smith Intern, Inc., 741 F.2d 707 (5th Cir.1984) (In an amicus brief, the SEC noted that "[d]uring the 1983 fiscal year, approximately 1,700 schedule 13(d) reports and 3,700 amendments to those reports were filed pursuant to section 13(d) by persons or groups acquiring more than five percent of a class of securities. More importantly, these filings are only a small part of the many thousands of disclosure documents filed with the Commissioner each year under the federal securities laws. The Commission does not have the resources to police the truthfulness of the myriad 13(d) filings made each year." Brief of Amicus SEC at 3 n. 2.)