**APL LIMITED PARTNERSHIP**

v.

**VAN DUSEN AIR, INC., et al.**

**Civ. No. 4–85–932.**

United States District Court,
D. Minnesota,
Fourth Division.

Aug. 19, 1985.

Richard B. Solum, Lindquist & Vennum, Minneapolis, Minn., Sanford M. Litvack, William Ruane, Charles W. Gerdts, III, Donovan, Leisure, Newton & Irvine, New York City, for plaintiff, APL.

Robert E. Woods, Jerry Rotman, Briggs & Morgan, Minneapolis, Minn., Gregory Joseph, William McGuiness, Fried, Frank, Harris, Shriver & Jacobson, New York City, for defendant Van Dusen Air, Inc.

Alan J. Gilbert, Sp. Asst. Atty. Gen., Barry Greller, St. Paul, Minn., for the State of Minn.

## ORDER

ROSENBAUM, District Judge.

### I. *Introduction*

At issue in this case is the constitutionality of the Minnesota Control Share Acquisition Act (MCSAA), Minn.Stat. §§ 302A.011(37)–(40), 302A.449(7), and 302A.671 (1985), a statute which regulates the acquisition of over 20% ownership of the voting stock of certain corporations. The issue comes before this court upon the motion of plaintiff APL Limited Partnership (APL) for an order pursuant to 28 U.S.C. § 2201 declaring that the MCSAA is facially unconstitutional. The basis of APL's request is that the MCSAA violates the Commerce Clause and the Supremacy Clause of the United States Constitution.

APL is a Delaware limited partnership with its principal place of business in New York City. The partnership is primarily owned by Jeffrey Miller, Jeffrey Tabak and Gary Hirsch. The defendant Van Dusen Air Incorporated (VDAI) is a Minnesota corporation engaged in the business of providing aviation related products and services to commercial airlines. Approximately 21% of VDAI's 1,100 employees live in Minnesota; 25% of its assets are located in Minnesota; and 25% of its common stock is owned by Minnesota residents.[1] On July 29, 1985, APL disclosed that it had been purchasing shares of VDAI in the open market. As of August 2, 1985 APL had purchased approximately 18% of the outstanding common stock of VDAI.

On the same day APL disclosed its purchase of VDAI shares on the open market, APL filed this action against VDAI and the State of Minnesota seeking a declaration, *inter alia,* that the Minnesota Statute was

---

1. The amount of stock owned by Minnesota residents may be somewhat less since APL began purchasing shares on the open market.

facially invalid as a violation of the Commerce and the Supremacy Clauses of the United States Constitution. At oral argument on August 9, 1985, counsel for APL premised its argument on the assertion that the MCSAA imposes an unreasonable burden upon interstate commerce and that the area had been preempted by the Williams Act.

At the preliminary injunction hearing on August 9, 1985, all parties agreed that there was no need to present testimony on the issues raised by APL's complaint. Accordingly, and by agreement of the parties, the court will treat the preliminary injunction hearing as a hearing for final injunctive relief. *See* Fed.R.Civ.P. 65(a)(2).

This action does not represent the first attack upon a Minnesota statute designed to regulate attempted takeovers of a Minnesota corporation. In *Cardiff Acquisitions, Inc. v. Hatch,* 751 F.2d 906 (8th Cir.1984) and *Edudata Corp. v. Scientific Computers, Inc.,* 746 F.2d 429 (8th Cir. 1984) the Eighth Circuit Court of Appeals considered the constitutionality of the Minnesota Corporate Takeover Act, Minn.Stat. § 80B.01 *et seq.* In both cases the Eighth Circuit upheld the particular sections of the Minnesota statute then at issue. The present case, however, involves a different statute, § 302A.671, from that at issue in *Cardiff* and *Edudata* and while these decisions provide guidance, they do not control this action. To determine whether the MCSAA violates the Constitution, it is first necessary for this Court to briefly outline the provisions of the MCSAA and the Williams Act.

### A. *The Minnesota Control Share Acquisition Act*

In 1984 Minnesota adopted the MCSAA as part of a series of amendments to the Minnesota Business Corporation Act. The stated purposes of the MCSAA were to (1) assure that the impact of a takeover was disclosed prior to its consummation, (2) provide necessary information to enable shareholders to cast informed votes, and (3) encourage reasoned decision making on the part of the shareholders of the target cor-

poration. Minn.Laws Ch. 488 § 2 (1984). The MCSAA seeks to provide two types of protection for stockholders of a corporation. First, it provides shareholders with information about the future plans of the person seeking to acquire over 20% of the voting stock. Second, and perhaps most important, it permits stockholders to block the acquisition through a shareholders vote.

The MCSAA, by its terms, applies to any "issuing public corporation" which is a corporation organized under Minnesota law with at least 50 shareholders and which has either: (1) its principal place of business in Minnesota, or (2) owns assets in Minnesota with a fair market value in excess of $1,000,000. Minn.Stat. § 302A.011(39) (1985). By its terms, the statute imposes no requirement that any shareholders of the corporation be residents of the state of Minnesota.

The statute requires that an acquiring person—any person proposing to make a control share acquisition—must disclose certain information to the shareholders of the target corporation prior to the statutory shareholders meeting. Minn.Stat. § 302A.671(2) (1985). The information statement requires the acquiring person to disclose, *inter alia,* the terms of the control share acquisition, the source of funds, any plans to liquidate the corporation, and any plans to move the location of its principal executive offices or business activities. Minn.Stat. § 302A.671(2).

Within 5 days of the time it receives the information statement, the board of directors of the target company must call a special stockholders meeting for the purpose of considering the proposed control share acquisition. Minn.Stat. § 302A.671(3) (1985). The meeting must be held within 55 days after receipt of the information statement unless the acquiring person agrees to a later date. *Id.* The acquiring person has a right to demand that the shareholders meeting not be held sooner than 30 days after the target company receives the information statement. *Id.*

The notice of the shareholders meeting must be accompanied by the information statement and a statement of the position of the board of directors on the proposed control share acquisition. *Id.* The notice of the shareholders meeting must be given within 25 days after the target corporation receives the information statement. *Id.*

The key provision of the MCSAA at issue in the present proceeding is § 302A.671 which provides in relevant part that a person may not acquire over 20% of the voting shares of a corporation unless [2]:

(1) the proposed control share acquisition is approved by the affirmative vote of the holders of a majority of the voting power of all shares entitled to vote.

\* \* \* \* \* \*

and (2) the proposed control share acquisition is consumated within 180 days after shareholder approval.

Minn.Stat. § 302A.671(4) (1984). The net effect of § 302A.671 is to (1) restrict the ability of a designated prospective purchaser (the acquiring person) and any potential selling shareholder (both of whom may be non-citizens of Minnesota) to buy and sell stock; (2) prevent the acquiring person from acquiring stock between the time he reaches 20% and the time the approval meeting is held; and (3) permanently prevent the acquiring person from acquiring stock from a willing seller unless the acquiring person can obtain shareholder approval.

The MCSAA also permits both the acquiring person and the management of the target corporation to solicit proxies in anticipation of the shareholders meeting. Minn.Stat. § 302A.449(7) (1985). However, proxies may not be solicited during the 30 days prior to the shareholders meeting unless the acquiring person and target corporation agree. *Id.* The statute penalizes those who violate the MCSAA by (1) denying voting rights for one year, (2) rendering the acquired shares nontransferable for one year, and (3) providing that the acquired shares may at the option of the target corporation, be redeemed for the same price at which they were acquired. Minn.Stat. § 302A.671(1)(b) (1985).

## B. *The Williams Act*

The Williams Act was adopted by Congress in 1968 as a "response to the increased use of cash tender offers in corporate acquisitions, a device that had 'removed a substantial number of corporate control contests from the reach of existing disclosure requirements of the Federal securities laws.'" *Edgar v. MITE Corp.*, 457 U.S. 624, 632, 102 S.Ct. 2629, 2635, 73 L.Ed.2d 269 (1982) *quoting Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 22, 97 S.Ct. 926, 939, 51 L.Ed.2d 124 (1977).[3] The Williams Act contains two types of provisions. First, it establishes disclosure requirements designed to protect all shareholders of the target corporation. Second, it guarantees certain rights to those shareholders of the target corporation who elect to tender their stock.

The disclosure provisions of the Williams Act are found in 15 U.S.C. § 78m(d)(1). A tender offeror is required to disclose his background, identity, the source of the funds being used in making the purchase, the extent of his holdings and his future plans for the target corporation. 15 U.S.C. § 78m(d)(1). The purpose of these requirements is to permit shareholders of the target corporation, when faced with a tender offer, to make an informed decision on whether to tender their stock. *See e.g. MITE Corp. v. Dixon*, 633 F.2d 486 (7th Cir.1980) *aff. sub. nom. Edgar v. MITE*

---

**2.** The MCSAA applies to any transaction which could leave the acquiring person with (a) at least 20% but less than 33⅓%; (b) at least 33⅓% but less than or equal to 50%; or (c) over 50%. The statute only applies to a change in range, it does not apply to changes within such designated ranges. *See* Minn.Stat. § 302A.671(2) (1985).

**3.** Prior to the 1960's, most corporate control contests were waged through proxy fights which were regulated by § 14 of the Securities Exchange Act. As cash tender offers became more popular, Congress decided they should be subject to similar regulation and accordingly passed the Williams Act.

*Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982).

The Williams Act also supplies a second tier of substantive rights to those shareholders·of the target corporation who elect to tender their stock. Shareholders who accept the offer can withdraw their acceptance within the first 7 days of the offer and after 60 days from the start of the offer. 15 U.S.C. § 78n(d)(5). The Williams Act also requires that if the offer is oversubscribed the offeror must purchase the shares on a pro rata basis during the first 10 days of the offer. 15 U.S.C. § 78n(d)(6). Moreover, if during the course of the offer the price per share is increased, all shareholders who tender their stock to the offeror will receive the increased price. 15 U.S.C. § 78n(d)(7). *See also, Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 22–23, 97 S.Ct. 926, 939–940, 51 L.Ed.2d 124 (1976).

The primary purpose behind the Williams Act was to protect the shareholders of the target corporation. As part of the effort to protect shareholders, however, Congress carefully avoided giving any undue advantage to either the tender offeror or incumbent management. *Edgar v. MITE Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). Congress did not want to deny shareholders "the opportunities which result from the competitive bidding for a block of stock of a given company." See 113 Cong.Rec. 24666 (1967) (remarks of Sen. Javits), cited in, *Edgar v. MITE Corp.*, 457 U.S. 624, 633 n. 9, 102 S.Ct. 2629, 2636 n. 9, 73 L.Ed.2d 269 (1982).

## II. *Commerce Clause*

■ This Court is mindful that a legitimately enacted statute is presumed constitutional. In the case at bar, however, the plaintiff argues that the MCSAA violates the Commerce Clause of the United States Constitution asserting that the burden the MCSAA places upon interstate commerce is excessive in relation to the local benefits it serves. The Commerce Clause provides that "Congress shall have power ... [t]o regulate commerce ... among the several states." U.S. Const., Art. 1, § 8, cl. 3. The Commerce Clause, standing alone, places some limitations upon the power of states to regulate interstate commerce. See *Cooley v. Board of Wardens*, 12 How. (53 U.S.) 299, 13 L.Ed. 996 (1852). However, not every regulation of interstate commerce by a state necessarily violates the commerce clause. A state statute designed to serve a legitimate local objective which incidentally regulates interstate commerce will be upheld unless the burden on interstate commerce is excessive in relation to the local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). Thus, in making a determination as to whether the MCSAA violates the Commerce Clause this Court must balance the local benefits of the statute against any burden placed on interstate commerce.

Any analysis of whether the MCSAA violates the Commerce Clause must include a discussion of the Supreme Court's recent decision in *Edgar v. MITE Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). In *Edgar* the Supreme Court considered a challenge to the Illinois Business Takeover Act. The Illinois Business Takeover Act contained several provisions which the Supreme Court deemed significant for purposes of its decision. First, the Act required a tender offeror to notify the target company and the Illinois Secretary of State of its intention to make a tender offer 20 days before the offer became effective. Second, the Act permitted the Secretary of State to hold a hearing to adjudicate the fairness of the tender offer and to deny registration if it felt the offer was not fair. Third, the Act required the Secretary of State to call a hearing if requested to do so by persons holding 10% of the outstanding shares subject to the tender offer.[4] Fourth, the statute was not restricted to corporations organized under the laws of Illinois.

---

4. The Court thought this provision was important since, in many cases, management controls 10% of the shares.

The Illinois Act was attacked on the basis that it violated the Commerce Clause and the Supremacy Clause. Justice White, writing for the plurality, issued a five part decision which held that the Illinois Act violated both provisions of the Constitution. Other than Section I, reciting the facts of the case, and Section II, which found it not to be moot, the only part of the opinion which commanded a majority of the court was part V–B holding that the Illinois Business Takeover Act violated the Commerce Clause because the burdens it imposed upon interstate commerce were unreasonable in relation to the benefits to Illinois. *Id.* at 643, 102 S.Ct. at 2641.

In balancing the local benefits against the burden on interstate commerce, the Court identified three ways in which the challenged Illinois Act burdened interstate commerce. First, the Act burdened interstate commerce because the statute was not limited to Illinois corporations. *Id.* Second, the Court noted that the effect of allowing the Secretary of State to pass upon the fairness of the tender offer deprived shareholders of the opportunity to sell their shares at a premium. *Id.* Third, the Court noted that by inhibiting tender offers the incentive for incumbent management to perform well was reduced. *Id.*

The Court then went on to examine the benefits claimed by the State of Illinois. With respect to Illinois' interest in protecting shareholders, the Court stated that:

> While protecting local investors is plainly a legitimate state objective, the state has no legitimate interest in protecting nonresident shareholders. Insofar as the Illinois law burdens out-of-state transactions, there is nothing to be weighed in the balance to sustain the law.

*Edgar v. MITE Corp.,* 457 U.S. 624, 644, 102 S.Ct. 2629, 2641, 73 L.Ed.2d 269 (1982). With the MITE teachings in mind, the Court turns to an examination of the suggested Minnesota interests.

### A. *Minnesota's Local Benefits*

To determine whether or not there is an impermissible conflict between the MCSAA and the Commerce Clause this Court must balance the local benefits of the statute against the burden it places upon interstate commerce. Before analyzing each of the defendants' arguments, it is necessary for this Court to distinguish between two commonly confused terms; local *interests* and local *benefits.* The Commerce Clause, as interpreted by the Supreme Court, requires a court to balance *benefits* against burdens; not *interests* against burdens. See *Edgar v. MITE Corp.,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269. The difference, while subtle, is crucial to a proper Commerce Clause analysis.

A state may have a legitimate desire to accomplish a certain objective. That desire represents an interest of the state. However, to the extent that a statute which burdens interstate commerce fails to further the state's desired result, that statute will not result in any local benefits to a state. Under the Supreme Court's decisions applying the Commerce Clause, the state of Minnesota may not prevail by simply demonstrating that its statute *was designed* to further a legitimate state interest. It must also demonstrate that its legitimate interest will, in fact, be served by the statute. The propriety of this approach was made clear in *Edgar* where the Supreme Court, after first recognizing that the state of Illinois had an *interest* in protecting resident shareholders, went on to "conclude that the protections the Illinois Act affords resident security holders are, for the most part, speculative." *Id.* at 639, 102 S.Ct. at 2639. A Commerce Clause analysis which required this Court to *assume* that the state's interests would be advanced by a statute would mean that only in those rare cases where the state artlessly failed to set forth laudable interests could a court strike down a statute as a violation of the Commerce Clause. This court has the constitutional duty to determine whether State-desired benefits can, in fact, result from the statute and only those which are not "speculative" may be placed in the scale to be balanced against the burden on interstate commerce.

By its terms the MCSAA seeks to assure that the impact of a takeover (1) is timely disclosed to shareholders, (2) that information will be provided to insure that shareholders can cast informed votes, and (3) to encourage reasoned decision making by those shareholders. Minn.Laws Ch. 488 § 2 (1984). These are the state's asserted *interests*, and if accomplished would be the *benefits* which this Court is directed by *Pike* to balance against any burdens on interstate commerce.

This Court agrees that the disclosure provisions of the MCSAA provide relevant information to Minnesota shareholders. However, it is worth noting that most of the information provided by the MCSAA is also mandated by the Williams Act. Thus, the benefits that result from the disclosure provisions of the MCSAA are limited to the marginal increase in information supplied by the statute.

The defendants in this action argue that the state of Minnesota has an interest in protecting shareholders of Minnesota corporations. The State of Minnesota consistently refers to its interest in protecting *shareholders of Minnesota corporations* rather than Minnesota shareholders. But the MCSAA is not restricted, or even specifically directed to Minnesota shareholders. The MCSAA would apply even if there were *no* Minnesota shareholders, and, as stated above:

> While protecting local investors is plainly a legitimate state objective, the state has no legitimate interest in protecting nonresident shareholders. Insofar as the Illinois law burdens out-of-state transactions, *there is nothing to be weighed in the balance to sustain the law.*

*Edgar v. MITE Corp.*, 457 U.S. 624, 644, 102 S.Ct. 2629, 2641, 73 L.Ed.2d 269 (1982) (emphasis supplied).

Similarly, Minnesota has no interest in protecting nonresident shareholders even if they own stock in a Minnesota corporation. Thus, to the extent the MCSAA burdens interstate commerce there are no "local

benefits" that arise from the statute's application to nonresident shareholders. *Id.* In the present case, this burden is substantial since over 75% of the outstanding stock of VDAI is owned by nonresidents and there is, according to the Supreme Court, nothing to be weighed in the balance. In *Cardiff Acquisitions, Inc. v. Hatch*, 751 F.2d 906 (8th Cir.1984) the Eighth Circuit upheld the validity of Minnesota's Take-Over Act against a Commerce Clause attack. That Act, however, was only triggered when the target corporation had a significant number of Minnesota shareholders and the suspension of the take-over offer applied only to Minnesota shareholders. That Act was narrowly tailored to serve Minnesota's local interests without imposing an unreasonable burden on interstate commerce.

■ As mentioned above, Minnesota does have a legitimate interest in protecting resident shareholders and the MCSAA does give Minnesota shareholders a voice in the direction of Minnesota corporations. However, even where substantial local benefits flow from a statute, it may still be invalid if the same benefits could be achieved through a lesser burden on interstate commerce. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). As the *Pike* Court stated:

> the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and *on whether it could be protected as well with a lesser impact on interstate activity.*

*Id.* at 142, 90 S.Ct. at 847 (emphasis supplied). The state of Minnesota could have achieved its goal of protecting resident shareholders by restricting the application of the MCSAA to those domestic corporations with some Minnesota shareholders. The MCSAA applies to corporations even if there are no resident shareholders and thereby attempts to regulate the economic relationship between two nonresident shareholders.[5]

---

**5.** Since, in the present case, over 75% of the     outstanding stock of VDAI is owned by nonresi-

Minnesota also claims an interest in protecting the state's business climate. This Court does not dispute the right of a state to enact legislation which serves to foster a habitable business climate. The relationship between that objective and the MCSAA is, however, less than clear. It appears to be based upon the questionable assumption that a person who acquires 20% of the voting stock of a corporation, whether that person is a resident or nonresident of Minnesota, is likely to engage in activity that is deleterious to Minnesota's business climate, such as moving the corporate headquarters or base of operations outside of Minnesota. Without considering (a) whether the assumption is correct or (b) whether any nonresident or even any Minnesota shareholder would care about a move, it is significant to note what the state chose not to regulate. The statute does not place any restriction upon incumbent management's ability to freely move its corporate headquarters or base of operations. Exceptions of this kind "tend to undermine [Minnesota's] justification for the burdens the statute imposes on interstate commerce. *Edgar v. MITE Corp.*, 457 U.S. 624, 644, 102 S.Ct. 2629, 2641, 73 L.Ed.2d 269 (1982).[6]

The defendants have also argued that the MCSAA is a valid exercise of the state's authority to regulate the internal affairs of corporations organized under its laws. They analogize the MCSAA to Minnesota's traditional corporate regulation of the number of incorporators, number of directors, par and no-par stock, and staggered or non-staggered terms of directors. The court rejects this analysis. The "inter-

nal affairs" mentioned above represent Minnesota's regulation of a *Minnesota corporation*. The MCSAA regulates shareholders, who may not be residents of Minnesota. Regulation of *shareholders*—and those who would become shareholders—is not the same as regulating the corporation itself.

There is little doubt that a state has some constitutionally sanctioned right to govern the internal affairs of its corporations. The debate centers on the meaning of "internal affairs." In *Edgar* the state of Illinois argued that its Business Takeover Act was constitutional because of Illinois' overriding interest in regulating internal affairs of its corporations. The Supreme Court disagreed stating:

> That doctrine is of little use to the state in this context. Tender offers contemplate transfers of stock by stockholders to a third party and *do not themselves implicate the internal affairs of the target company.*

*Edgar v. MITE Corp.*, 457 U.S. 624, 645, 102 S.Ct. 2629, 2642, 73 L.Ed.2d 269 (1982).

In the present case the MCSAA restricts the ability of a nonresident shareholder to sell shares to a nonresident third party. The defendant's argument that the MCSAA is simply an "internal affairs" regulation stems from a failure to distinguish between the *acquisition of shares* and the exercise of power as a result of that acquisition. The acquisition of shares does not implicate the internal affairs of the target corporation. The use of that power *once the shares have been acquired* may well be

---

dents, this Court need not decide whether a statute which applied to only Minnesota shareholders would violate either the Commerce Clause or the Supremacy Clause.

**6.** These considerations are critical since the MCSAA will not prevent any corporation from moving out of the state unless one assumes that the shareholders would prevent the consumation of a proposed control share acquisition if the acquiring person disclosed plans to move the base of operations of the target corporation out of Minnesota. If the shareholders would not oppose such a move, the statute does not serve the state's interest in protecting the local

business climate and there are no "benefits" to be placed in the balance against the burden imposed on interstate commerce. While this Court may engage in the questionable assumption that resident investors would react in such a manner, it is inconceivable that the nonresident shareholders of VDAI who own 75% of the voting stock would vote against the proposed control share acquisition solely to benefit Minnesota's business climate. Thus, any benefits to Minnesota's business climate are nominal in relation to the burden the statute imposes on interstate commerce.

a proper subject of state regulation, but that is not what the MCSAA regulates.

## B. *Burdens*

The burdens imposed on interstate commerce by the MCSAA are substantial. It has the effect of restricting the right of non-residents to purchase and sell stock in Minnesota corporations. This burden is particularly significant in the case of publicly listed and traded corporations since there is little relationship between the state of incorporation and the likelihood that stockholders will be residents of that state. This case is an excellent example; while VDAI is a Minnesota corporation, approximately 75% of its stock is owned by nonresidents. Any restriction on the transferability of that stock is, perforce, a restriction upon interstate commerce.

In *Edgar v. MITE Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982) the Supreme Court described the burden on interstate commerce that flowed from the provisions of the Illinois Business Takeover Act which allowed the Secretary of State to block a tender offer stating:

> Shareholders are deprived of the opportunity to sell their shares at a premium. The reallocation of economic resources to their highest valued use, a process which can improve economic efficiency and competition is hindered. The incentive the tender offer mechanism provides incumbent management to perform well is reduced.

*Id.* at 643, 102 S.Ct. at 2641. The Court recognizes that the MCSAA does not permit the Secretary of State to block a control share acquisition, transferring that power instead to the shareholders of the corporation. That provision does, however, permit the shareholders to block a transfer of shares, thus leading to many of the same results as the Illinois statute.

The MCSAA restricts APL's ability to buy stock by requiring prior shareholder approval. If APL fails to obtain approval, a substantial buyer of VDAI stock will be removed from the market thereby preventing VDAI shareholders from receiving a premium for their stock. The statute also has the effect of insulating incumbent management by making control share acquisitions more difficult thereby reducing the incentive for incumbent management to perform well. *Id.* Finally, the MCSAA, like the Illinois Business Takeover Act, impedes the reallocation of economic resources. *Id.*

The state of Minnesota has argued that the requirement of prior shareholder approval for control share acquisitions is no different than the requirement of prior shareholder approval for a merger or sale of assets and that if this Court strikes down the MCSAA it must also strike down those provisions of the Minnesota Business Corporation Act (MBCA) which require shareholder approval for a merger or sale of assets. *See* Minn.Stat. § 302A.613(2); Minn.Stat. § 302A.661(2) (1984). Setting aside the obvious fact that the constitutionality of the merger and sale of assets provisions of the MBCA are not before the Court at this time, this court cannot accept the state's "merger" analogy.

The state's merger analogy perpetuates the state's confusion between regulation of a corporation and the regulation of those who would trade in shares. One obvious difference between the MCSAA and those provisions of the MBCA requiring shareholder approval for a merger or sale of assets is that the latter only apply to Minnesota corporations. The merger provision of the MBCA restricts the ability of a *Minnesota corporation* to merge. That is a lawful exercise of the state's authority to regulate a legal entity created by state statute. While the MCSAA also applies only to Minnesota corporations, it does not purport to regulate the activities of the corporation; rather, it reaches out and regulates *shareholders* who may or may not be residents of Minnesota.

## III. *Conclusion*

The MCSAA is a different statute from the Illinois Act under consideration in *Edgar v. MITE Corp.*, yet it suffers from many of the same constitutional infirmities. This Court does not dispute that Minnesota has legitimate interests which it sought to

advance in passing the MCSAA. However, the benefits that will actually accrue from the statute are, at best, speculative. To the contrary, the burdens imposed by the statute represent a substantial intrusion upon the policies embodied in the Commerce Clause.

 On balance, this Court finds that the speculative local benefits which may accrue to Minnesota are outweighed by the direct burdens imposed on interstate commerce. Accordingly, this Court concludes that the MCSAA violates the Commerce Clause of the United States Constitution.[7]

For the reasons stated above, IT IS ORDERED that:

1. Minn.Stat. § 302A.671 is facially invalid as a violation of the Commerce Clause of the United States Constitution.

2. The defendants and their agents are permanently enjoined from taking any action to enforce Minn.Stat. § 302A.671 or any other provision of the Minnesota Control Share Acquisition Act against the plaintiff APL in connection with APL's acquisition of shares of VDAI.

### ORDER

On August 16, 1985 this Court issued an order pursuant to 28 U.S.C. 2201 and an injunction pursuant to Fed.R.Civ.P. 65 declaring the Minnesota Control Share Acquisition Act (MCSAA), Minn.Stat. 302A.671, unconstitutional and enjoining the defendants from attempting to enforce the MCSAA against plaintiff APL. Accompanying that order was a 21 page memorandum which explained the basis of this Court's decision.

Immediately after issuing the order and memorandum, this Court discovered an error in its memorandum which, when corrected, does not lead this Court to change its order. The Court has corrected that error and now issues the attached su-

perseding memorandum. The order of August 16, 1985 shall remain the same.

IT IS SO ORDERED.

---

7. All parties to this action have extensively briefed and argued the issue of whether the MCSAA violates the Supremacy Clause on the ground that it is preempted by the Williams Act.

Having decided that the MCSAA violates the Commerce Clause this Court need not address any other issues.