**GELCO CORPORATION, a Minnesota corporation, Plaintiff,**

**and**

**The State of Minnesota by Hubert H. Humphrey, III, its Attorney General, Plaintiff-Intervenor,**

**v.**

**CONISTON PARTNERS; GEL Associates; Paul E. Tierney; Keith R. Gollust; Augustus K. Oliver; Gollust, Tierney and Oliver, Inc., Defendants and Counterclaimants,**

**and**

**GEL ACQUISITION CORPORATION, Counterclaimant,**

**and**

**Cubit Corporation, Counterclaimant-Intervenor,**

**v.**

**GELCO CORPORATION; Samuel D. Addoms; Neil E. Goldschmidt; Harold I. Grossman; Michael J. Morris; Clarence W. Spangle; Jaye F. Dyer; William F. Foss; Andrew C. Grossman; Mark H. Willes; Jack J. Crocker; N. Bud Grossman; M.D. McVay; Sam Singer; and The State of Minnesota by Hubert H. Humphrey, III, its Attorney General, Counterclaim Defendants.**

Civ. No. 3–86–847.

United States District Court,
D. Minnesota,
Third Division.

Nov. 10, 1986.

George F. McGunnigle, Jr., Leonard, Street and Deinard, Minneapolis, Minn., Andrew Sussman, William Frelich, Gregory Joseph, Fried, Frank, Harris, Shriver & Jacobson, New York City, for plaintiff.

Irwin H. Warren, Weil, Gotshal & Manges, New York City, Jerry Simon, Mann, Green, Hayes, Simon, Johanneson & Brehl, St. Paul, Minn., for defendants.

Alan Gilbert, Barry Greller, Minn. Office of Atty. Gen., St. Paul, Minn., for plaintiff-intervenor.

RENNER, District Judge.

Before the Court is Counterclaimants' motion for a preliminary injunction to enjoin Counterclaim-defendants, and all persons acting in concert with them, from taking any action to enforce or apply provisions of the Minnesota Control Share Acquisition Act, Minn.Stat. § 302A.671, to, against, or with respect to Counterclaimants' pending tender offer for Gelco shares.[1] Argument was heard on November 3, 1986 and the Court took the issue under advisement. Jerry Simon and Irwin Warren appeared for Counterclaimants. Alan Gilbert appeared for Plaintiff-intervenor and Counterclaim-defendant State of Minnesota. Gregory Joseph and George McGunnigle, Jr. appeared for the remaining Counterclaim-defendants. All parties agreed that it was not necessary for the Court to hear testimony on the issues raised by the challenge to the Minnesota statute. Accordingly, the Court will treat the preliminary injunction hearing as a

---

1. By Order dated October 27, 1986, this Court granted Counterclaimants' motion for a temporary restraining order enjoining enforcement of the Minnesota Control Share Acquisition Act, Minn.Stat. § 302A.671, to, against, or with respect to Counterclaimants' pending tender offer pending determination of Counterclaimants' motion for preliminary injunction.

hearing for final injunctive relief. Fed.R. Civ.P. 65(a)(2).

Also before the Court is Counterclaim-ants' motion for a preliminary injunction to: (1) enjoin the purchase by Gelco of any shares of Gelco common stock pursuant to the Exchange Offer announced by Gelco on October 7, 1986; (2) enjoin Gelco from using the cash proceeds from the sale of Gelco preferred stock to Merrill, Lynch & Co.; (3) void any voting or conversion rights attendant to the preferred stock issued to Merrill Lynch; (4) enjoin enforceability of Gelco's Preferred Stock Purchase Rights Plan; and (5) direct defendant directors of Gelco to redeem, rescind or amend Gelco's Rights Plan so as to make it inapplicable to Counterclaimants' tender offer. Argument was heard on the motion on November 5, 1986. Jerry Simon and Irwin Warren appeared for Counterclaimants. Alexander Sussman and George McGunnigle, Jr. appeared for Counterclaim-defendants.[2] The Court took the matter under advisement.

The pending motions stem from a battle for corporate control.[3] Counterclaimants contend that incumbent management of Plaintiff and Counterclaim-defendant Gelco Corporation is illegally thwarting the counterclaimants' $26 all-cash tender offer for all outstanding shares of Gelco common stock.

FINDINGS OF FACT

Plaintiff and Counterclaim-defendant Gelco ("Gelco") is a Minnesota corporation with its principal place of business in Minnesota. Its common stock is publicly held and traded on the New York Stock Exchange.[4] The remaining Counterclaim-defendants are each, and at all relevant times hereto were, Directors of Gelco (collectively, "the Board"). The majority of the Gelco Board are outside directors who lack significant stockholdings. However, all executive officers and directors as a group beneficially own approximately 17% of the outstanding shares (substantially all of which is held by the Grossman family).

Defendant and Counterclaimant Coniston Partners is a New Jersey based limited partnership that is engaged in the business of buying and selling securities. Defendant and Counterclaimant GEL Associates is a Bahamas partnership of which Coniston is the principal limited partner. Defendant and Counterclaimant Gollust, Tierney and Oliver, Inc. is a New York based investment firm and is a principal of Coniston. The remaining Defendants and Counterclaimants are members of Coniston. Counterclaimant GEL Acquisition Corporation is a wholly owned subsidiary of Coniston. For purposes of this memorandum, the Defendants and Counterclaimants will be referred to collectively as "Coniston."

In early 1986, Gelco began evaluating defensive strategies to protect the corporation against unsolicited bids for the corporation's stock. On May 6, 1986, the Directors of Gelco, without a shareholder vote, adopted a Preferred Stock Purchase Rights Plan (the "Rights Plan" or "Poison

2. By motion dated November 4, 1986, Cubit Corporation, a public shareholder of Gelco Corporation, sought to intervene in the action as a Counterclaim-plaintiff, pursuant to Fed.R.Civ.P. 24(a). Joseph Anthony appeared for Cubit Corporation at the November 5, 1986 hearing but was not permitted to argue the merits of the pending motions. Subsequently, on November 7, 1986, the parties stipulated to allowing Cubit Corporation to intervene in the action.

3. Plaintiff Gelco Corporation initiated this action on October 2, 1986, by filing a complaint seeking injunctive, declaratory and other relief to prevent defendants' alleged violations of federal and state securities law in connection with an alleged illegal scheme to seize control of Gelco. Defendants commenced a parallel action in New York District Court on the same day. That suit, *inter alia,* alleged that Gelco and its board of directors violated federal securities laws and breached fiduciary duties owed to shareholders by using a company self-tender to block Coniston's all cash tender offer for all outstanding Gelco shares. On October 9, 1986, the New York action was transferred to this District.

4. By Order dated October 3, 1986, Judge Devitt granted the intervention petition of plaintiff-intervenor the State of Minnesota. The State's interest in the pending motions in its capacity as a counterclaim defendant is limited solely to the issue of the constitutionality of the Minnesota Control Share Acquisition Act.

Pill") pursuant to which a dividend of one preferred stock purchase right was declared for each outstanding share of Gelco stock.

Under the plan's "flip-in" provisions, this right, once exerciseable, entitles the shareholder to purchase, for the exercise price of $63, common stock (one twentieth of a share of Class B, Series 1 Participating Preferred stock) worth two times the exercise price ($126). The right is not exerciseable by any acquiring person.

The right is exerciseable on the tenth day following the earlier of (i) the public announcement that, without the prior consent of the Gelco Board, a person or group has acquired, or obtained the right to acquire, beneficial ownership of securities having 20% or more of the voting power of all outstanding voting Gelco securities, or (ii) the commencement of, or announcement of, an intention to make a tender offer or exchange offer which would result in any person or group having beneficial ownership of securities having 20% or more of the outstanding common stock.

The plan also contains "flip-out" provisions. In the event that (a) Gelco merges with or into, or consolidates with, any other entity, or (b) any entity merges with and into Gelco where Gelco is not a surviving corporation, each right holder becomes entitled to purchase for the exercise price of $63 a number of shares of common stock of such other entity having a market value of two times the exercise price.

Once triggered the rights are redeemable by the Gelco Board on several conditions: (1) at any time before a 20% position has been acquired without prior approval of the Board; (2) if the 20% shareholder reduces his ownership below 5% in transactions not involving the company; or (3) in connection with certain transactions not involving the 20% shareholder, e.g., a merger with a friendly company; and (4) after the expiration of any period during which a holder may exercise the rights, if, and for as long as, a 20% shareholder owns less that 20% of the voting power of the company.

The Gelco Board gave itself discretion to unilaterally amend the Rights Plan and did so on October 7, 1986 when it announced that the plan would not be triggered by Gelco's Exchange Offer.

Significantly, Gelco was not aware of any acquisition effort by any person or entity at the time of plan adoption. The Board unanimously approved the plan only after hearing presentations from the company's independent investment advisor, Drexel Burnham Lambert, Incorporated ("Drexel Burnham"), and outside legal counsel. According to the Minutes of the May 6, 1986 Board meeting, the presentations specifically addressed the basis for the plan's exercise price of $63 and the reasonability of the exercise price as an estimate of the long-term value of the corporation. .

The plan, without question, makes it difficult for an outsider to acquire control of the Company without Board approval. However, it does not appear that the plan was adopted with the sole purpose of entrenching incumbent management. Instead, the record shows that the directors were worried that Gelco's short term stock market value did not reflect the future benefits of the ongoing corporate restructuring plans. This made the Company particularly vulnerable to hostile raiders who could acquire the Company without paying an adequate control premium.

On June 26, 1986, the Board was advised of Unicorp Corporation's interest in acquiring between 15 and 25 percent of Gelco's shares. By agreement dated July 11, 1986, and subsequently approved by the Gelco Board on July 14, 1986, Gelco purchased 680,700 shares from Unicorp at $19 per share (a $4.50 premium above market value). In addition, Unicorp promised not to purchase any Gelco shares for at least 10 years.

In late August, as part of an ongoing business plan to streamline company operations and reduce unsecured corporate debt and interest expense, Gelco adopted a restructuring plan proposed by its investment advisor Merrill Lynch. The plan,

which was announced on August 26, 1986, included the sale of four Gelco business units, and a self-tender offer to purchase up to three million shares of outstanding common stock for not more than $20 nor less than $17 per share through a "dutch auction" procedure. The self-tender was to be financed by the sale of newly issued preferred stock to Merrill Lynch.

The preferred stock sales agreement calls for the sale of up to 3 million shares of newly created Class B, Series 2 Participating Cumulative Preferred Stock for $20 per share, for a maximum purchase price of $60,000,000. Pursuant to the agreement, the preferred stock pays dividends at a rate of 13% per annum for the first five months and 15% per annum thereafter. According to defendants, the agreement increases Gelco's domestic debt load $3,250,-000 for the first five months, and by $9,000,000 annually thereafter. The agreement gave either party the option to transfer an additional 400,000 shares of preferred stock to Merrill Lynch at $20 per share. This option was exercised by Gelco on Thursday, October 30, 1986.

Significantly, the preferred shares have voting rights. However, there is no voting agreement between Merrill Lynch and incumbent management. Merrill Lynch did agree to certain "stand-still" conditions. The company agreed that it would not purchase any additional Gelco voting securities for 30 months except from Gelco, and that it would not sell its preferred shares except under a limited set of circumstances (hostile tender offer not among them).

Gelco is free to redeem the preferred stock at any time for the original stock purchase price of $20 per share, plus accrued unpaid interest. Under the restructuring plans, the stock will be redeemed within 18 months or less upon the successful planned divestiture of certain Gelco businesses. Merrill Lynch suggests the stock will be redeemed in six to eight months. Friedman Affidavit, Exhibit N. The Gelco Board viewed the transaction as a form of "bridge-financing" for its self-tender. According to the Company, such financing would not otherwise be available because of covenants with Gelco's regular lenders.

The restructuring plan was adopted at an all-day board meeting during which directors heard presentations from outside legal counsel and investment advisors. Gelco's self-tender commenced on August 29, 1986. At the time of the announcement, Gelco's common stock was trading at $14.875 per share. The original deadline for shareholders to tender pursuant to the offer was September 26, 1986.

On September 25, 1986, the day before the self-tender was due to expire, Coniston purchased approximately 17.6% of the outstanding shares of Gelco. In a letter to Gelco management, Coniston proposed that negotiations begin for a merger transaction at $22.50 cash per share. Coniston specifically conditioned its proposal on Gelco's rescission of its self-tender and proposed sale of preferred stock to Merrill Lynch.

The following day, September 26, 1986, representatives of Gelco and Coniston discussed the proposal. Coniston emphasized that it was interested in pursuing merger negotiations and that it was prepared to increase its $22.50 all-cash offer. However, Coniston also made clear that it was not primarily interested in continued operations of the company.

Both parties allege that in the days immediately following Coniston's offer each attempted to "greenmail" the other. The Court would not be the least surprised if such offers were made by either side. However, the record is inconclusive. Therefore, alleged greenmailing is not a part of the Court's decision.[5]

---

5. Nonetheless, the Court notes that the record contains strong inferences of Gelco's attempt to buy Coniston's Gelco holdings at a premium. First, the Court cannot ignore the July payment of premium prices for Gelco shares held by Unicorp. Second, notwithstanding that Merrill Lynch representative Tull Gearrald denies any offers to treat Coniston differently than any other Gelco shareholder, a resolution adopted at the October 2, 1986 Gelco Board meeting, specifically authorizes negotiations for repurchase of Coniston's Gelco shares.

On September 29, 1986, Gelco and Merrill Lynch entered into a formal contract for evaluation of the Coniston proposal and other strategic financial planning. The agreement, *inter alia,* guaranteed the investment advisor $250,000 if a hostile acquisition did not occur within six months.

The Gelco Board held a nine hour meeting on October 2, 1986 to evaluate the Coniston proposal. The Board heard presentations from investment bankers and outside legal counsel, as well as Merrill Lynch's report that the Company's "median breakup value [is] approximately $31.57 per share and ranges as high as $39.03 per share." Affidavit of Tull N. Gearrald, Jr., ¶ 18. Merrill Lynch also presented financial reports indicating substantial increases in the value of Gelco stock after the restructuring, reaching $57.20 per share within four years. Based largely on these financial reports and the Board's reasonable perception that Coniston was a "raider" intending to liquidate the company's assets, the Board rejected the Coniston offer as inadequate from a financial point of view.

Coniston argues that the financial analysis prepared by Merrill Lynch is suspect. The Court agrees that Merrill Lynch had tremendous interest in the restructuring plans—including approximately $5 million in fees and future opportunities to provide up to $1 billion in financing. Friedman Affidavit, Exhibit N. Nonetheless, the Court puts great weight on the fact that Merrill Lynch prepared a preliminary financial analysis of the breakup value of the Company almost a full month prior to Coniston's initial proposal to negotiate a merger transaction. That preliminary analysis suggested that Gelco's "mid-point breakup value would be seen by an outsider as approximately $29.85 per share and could range as high as $37.86 per share." Affidavit of Tull N. Gearrald, Jr. ¶ 16. There is little reason to doubt the accuracy of this preliminary analysis, prepared, so to speak, prior to the heat of battle. Indeed, the Court notes that a report by Coniston's own financial experts, Wertheim & Company, estimated the breakup value to be $26.80 to $48.50. Friedlich Affidavit, Exhibit G. Thus, this Court is not troubled by the fact that Gelco directors relied on the Merrill Lynch valuation of breakup value in deciding that Coniston's offer was inadequate from a financial point of view.

With Gelco stock now trading at $23 per share as a result of Coniston's offer, the Board also decided to cancel the then pending $17–$20 dutch auction self-tender without having purchased any shares. Nonetheless, the Board reauthorized the sale of preferred stock to Merrill Lynch. An October 2, 1986 opinion letter prepared by independent investment advisor Drexel Burnham, advised the Board that the sale of preferred stock was fair to the Company from a financial point of view. A draft version of the opinion letter notes that Coniston offered to purchase the same preferred shares for a higher price. However, the record also shows that Coniston was not willing to adopt the "stand-still" restrictions agreed to by Merrill Lynch.

On October 7, 1986, Gelco announced an Exchange Offer scheduled to close on November 10, 1986. Under the pending offer, Gelco will purchase up to 6,000,000 shares of common stock. In exchange for each share, Gelco is offering (1) $10 in cash; and (2) one depository receipt representing one-tenth of a share of Class A, Series 4 Cumulative Preferred Stock—such receipt having a liquidation preference of between $16 and $20. The actual liquidation will be determined by "dutch auction", whereby shareholders specify the price between $16 and $20 at which they desire to tender. Under the terms of the offer, the Company will accept the greater of (i) the number of shares up to 6,000,000 specifying a liquidation preference of $16, or (ii) 3,000,000 shares specifying a liquidation preference between $16 and $20. All shares tendered in excess of the ultimate purchase price will be returned to shareholders. Excess shares tendered at or below the ultimate purchase price will be purchased on a pro rata basis.

The Exchange Offer itself notes that "the consummation of the Offer may adversely affect the market price of the shares that remain outstanding thereafter." The record suggests that the structure of the offer encourages all shareholders to tender, and to tender at the low end of the liquidation preference—for if shareholders do not tender all of their shares they will be left holding common stock that may decrease in value. However, the Exchange Offer also states that no Gelco executive officers or directors will tender shares under the Offer. The offer does not recommend that shareholders tender shares. According to Gelco, the Offer was designed to give stockholders a choice between liquidating their holdings now and still holding a stake in future growth or maintaining their current investment position, or a mix of both.

If Gelco's Exchange Offer goes forward and Merrill Lynch is allowed to exercise voting rights over its preferred shares, Gelco directors and management, together with Merrill Lynch, will control some 53% of the voting power of Gelco.

On October 24, 1986, Coniston commenced an offer to purchase all of Gelco's outstanding shares for $26 cash. The offer is subject to six conditions: 1) that 50% of outstanding shares be tendered; 2) that Coniston obtain adequate financing; 3) that Gelco redeem the Poison Pill; 4) that the Minnesota Control Share Acquisition Act be held invalid or inapplicable; 5) that the sale of preferred stock to Merrill Lynch be rescinded or enjoined; and 6) that Gelco abandon its Exchange Offer.

On October 30, 1986, the Gelco Board met for approximately five and one half hours to evaluate the Coniston proposal. Management, Merrill Lynch and legal counsel made presentations. The Board specifically addressed the issue of whether the Rights Plan should be redeemed. Partly in reliance on the financial analysis prepare by Merrill Lynch, and due to the Board's confidence in the long term value inherent in the company, the Board concluded that the Coniston offer was inadequate. Consequently, the Board decided to keep the Rights Plan in place and to reject Coniston's bid.

The Board did not ask for, and did not consider, a comparison of the present value of the Exchange Offer with Coniston's $26 all-cash offer. Coniston's financial analysis concluded that the "blended value" of the Exchange Offer is between $20.94 and $22.94.[6] Merrill Lynch estimates the "blended value" to be approximately $24.

In deciding these motions, the significance of the timing of the various transactions cannot be ignored. Gelco adopted the Rights Plan four months prior to Coniston's initial purchase of Gelco stock. The Gelco Board approved the restructuring plan including the self-tender and the sale of preferred stock to Merrill Lynch, almost a month prior to Coniston's first proposal to negotiate a merger.

## THE CONTROL SHARE ACQUISITION ACT

Coniston contends that the Control Share Acquisition Act (the "Act") is facially unconstitutional under (a) the Commerce Clause; and (b) the Supremacy Clause.[7] Considerable case law supports its contentions. *Dynamics Corp. of America v. CTS Corp.*, 794 F.2d 250 (7th Cir.1986) (Indiana control share acquisition statute held unconstitutional), *cert. granted,* —— U.S. ——, 107 S.Ct. 258, 93 L.Ed.2d 17 (1986); *Terry v. Yamashita*, 643 F.Supp.

---

**6.** Because Gelco's offer is only a partial offer and shareholders can expect to have their shares pro-rated for acceptance, it is necessary to value not only the cash and securities offered in the Exchange, but also the shares of common stock which they will be left with after the Exchange Offer is completed. The "blended value" represents an average of the price paid to shareholders in the Exchange Offer and the expected trading price of the remaining common shares at the time the exchange offer is completed.

**7.** All parties having agreed that it was not necessary for the Court to hear testimony on the issues raised by this challenge to the Minnesota statute, the Court is treating the motion for preliminary injunction as a motion for final injunctive relief. Fed.R.Civ.P. 65(a)(2).

161, [Current] Fed.Sec.L.Rep. (CCH) ¶ 92,-845, (D.Hawaii, June 13, 1986) (Hawaii control share acquisition statute held unconstitutional); *Fleet Aerospace Corp. v. Holderman,* 637 F.Supp. 742 (S.D.Ohio 1986) (Ohio control share acquisition statute held unconstitutional) *aff'd,* 796 F.2d 135 (6th Cir.1986); *APL Ltd. Partnership v. Van Dusen Air, Inc.,* 622 F.Supp. 1216 (D.Minn.1985) (earlier version of Minnesota control share acquisition statute held unconstitutional); *vacated as moot,* No. 85-5346 (8th Cir., November 25, 1985); *Icahn v. Blunt,* 612 F.Supp. 1400 (W.D.Mo.1985) (Missouri control share acquisition statute held unconstitutional).

In contrast, no cases uphold the validity of analogous state control share acquisition statutes.[8] However, Gelco vigorously distinguishes the decided cases. Indeed, the Minnesota Act is less onerous than any of the state statutes previously considered.

In 1984 the Minnesota Legislature enacted legislation pertaining to corporate takeovers. 1984 Minn. Laws ch. 488. The legislation (1) revised chap. 80B, the state securities law which regulates tender offers, and (2) created the Control Share Acquisition Act here at issue. The Act was amended in 1985, 1985 Minn.Spec.Sess. Laws ch. 5, and again in 1986, 1986 Minn. Laws ch. 431. The legislation's goal is to "provide to shareholders both necessary information and the opportunity to thus cast fully informed votes on any takeover transactions." 1984 Minn. Laws ch. 488, § 1, subd. 2(2).

The Act promotes these objectives in two ways: First, the Act requires certain disclosures about the future plans of any person seeking to acquire over 20% of the voting stock of a target company. Second, it permits stockholders to block the acquisition through a required shareholders vote. The Act applies to any "issuing public corporation"—a corporation organized under Minnesota Law with at least 50 shareholders and which has either: (1) its principal place of business in Minnesota, or (2) owns assets in Minnesota with a fair market value in excess of $1,000,000. Minn.Stat. § 302A.011(39). The parties agree that Gelco is subject to the act as an "issuing public corporation."

Significantly, the statute imposes no requirement that any shareholders of the corporation be residents of the state of Minnesota. In addition, the Act exempts mergers to which the corporation is a party, section 302A.011(38), 302A.601, and acquisitions directly from the corporation. Thus, Gelco's Exchange Offer is not subject to the Act.

Acquiring parties must disclose, *inter alia,* the terms of the control share acquisition, the source of the funds, any plans to liquidate the corporation, and any plans to move the location of its principal executive offices or business activities. Section 302A.671(2).

Within 5 days of the time it receives the information statement, the board of directors of the target company must call a special stockholders meeting for the purpose of considering the proposed control share acquisition. Section 302A.671(3). The meeting must be held within 20 business days after receipt of the information statement unless the acquiring person agrees to a later date. The notice of the meeting must be accompanied by the information statement and a statement of the position of the board of directors on the proposed control share acquisition.

The Act further provides that the control share acquisition cannot go forward unless: (1) the proposed control share acquisition is approved by the affirmative vote of the holders of a majority of the voting power of all shares entitled to vote; and (2) the proposed control share acquisition is consummated within 180 days after such approval. Section 302A.671(4).

---

**8.** The *Van Dusen* case was appealed to the Eighth Circuit, which heard the appeal on an expedited basis but ultimately was forced to dismiss the appeal as moot when the offeror and target company settled. That the Court of Appeals repeatedly stayed the effectiveness of the *Van Dusen* injunction against enforcement until it was finally dissolved is not, as plaintiffs suggest, persuasive authority concerning the constitutionality of the Act.

The Act demands that if the proposed acquisition is not approved by the shareholders, the acquiring person must immediately return any and all shares held in anticipation of consummation to shareholders from whom the person received the shares. Section 302A.671(6). The statute penalizes those who violate the Act by (1) denying voting rights for one year, (2) rendering the acquired shares nontransferable for one year, and (3) providing that the acquired shares may at the option of the target corporation, be redeemed for the same price at which they were acquired. Section 302A.671(1)(b).

■ As a starting point, it is clear that not all state regulation of tender offers runs afoul of the Commerce and Supremacy Clauses. For example, *Cardiff Acquisitions Inc. v. Hatch,* 751 F.2d 906 (8th Cir. 1984), affirmed the constitutionality of the Minnesota Corporate Take-Overs Act, Minn.Stat., 80B.01–.13. Significantly, that act is primarily a disclosure statute and applies only when at least 20% of a target company's shareholders are state residents. Failure to comply with the disclosure requirements terminates an offer only in Minnesota. In contrast, the Control Share Act applies regardless of whether any resident shareholders are involved; failure to gain shareholder approval terminates the control share acquisition nationwide. As Coniston asserts, the Act would bar a 19.9% holder in New York from making a 0.2% purchase from a Hawaiian shareholder unless and until notice was given, a shareholder meeting was held, and a majority of shareholders voted to approve the sale.

## THE COMMERCE CLAUSE

Coniston contends that the Act impermissibly imposes both direct and indirect burdens on interstate commerce.

■ The Commerce Clause of the United States Constitution provides that "Congress shall have power ... [t]o regulate Commerce ... among the several states." U.S. Const. Art. I, § 8, cl. 3. The clause limits the power of the states, *Great At-* *lantic & Pacific Tea Co. v. Cottrell,* 424 U.S. 366, 370–71, 96 S.Ct. 923, 927, 47 L.Ed.2d 55 (1976), and traditionally has been invoked to invalidate state laws which: (1) directly regulate interstate commerce; or (2) incidentally regulate interstate commerce, where "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). No clear line separates the categories of direct state regulation which are virtually *per se* invalid, and the categories subject to the *Pike* balancing approach. *Brown-Forman Distillers Corp. v. N.Y. State Liquor Authority,* —— U.S. ——, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986). Instead, "the critical consideration is the overall effect of the statute on both local and interstate activity." *Id.* 106 S.Ct. at 2084.

Coniston contends that the Act directly impinges on commerce because the Act's requirements apply even if none of the target company shareholders are citizens of Minnesota. This, Coniston argues, is an unconstitutional attempt to assert extraterritorial jurisdiction over out-of-state sellers and out-of-state purchasers of stock in interstate commerce. In support of this argument, Coniston relies on *Edgar v. MITE Corp.,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982) (plurality opinion) (holding Illinois anti-takeover statute unconstitutional), as well as three decisions invalidating control share acquisition statutes analogous to the one at issue here, *Terry, supra,* 643 F.Supp. 161, Fed.Sec.L.Rep. 92,845 at 94,113; *Icahn, supra,* 612 F.Supp. 1400, 1415–16; and *Fleet, supra,* 637 F.Supp. 742, *aff'd,* 796 F.2d 135.

These cases are distinguishable, however, and the Court declines to find the Act *per se* invalid as a direct restraint on interstate commerce. First, in *Edgar,* only four justices found the Illinois takeover statute to be a direct restraint on commerce. That statute required, *inter alia,* that the Secretary of State of Illinois hold a hearing on the substantive fairness of the offer if re-

quested by a majority of the target's outside directors, or by Illinois owners of 10 percent of the target's stock, and empowered the Secretary to disallow the offer if he found that it was substantively unfair. If the unilateral action of a state official in stopping a takeover bid was not considered a "direct" burden on interstate commerce, it follows that a majority of shareholders—from all states—voting in a referendum cannot be a "direct" burden.

*Terry* and *Fleet* are not persuasive authority as they relied on the *Edgar* plurality to strike down as posing "direct" burdens on commerce, respectively, the Hawaii and Ohio control share acts.

*Icahn* found unconstitutional a Missouri control share acquisition statute which applied to foreign corporations—posing the danger than more than one state's law would apply to takeover transactions. This form of direct interference in another state's corporate affairs is absent from the Minnesota Act.

The economic and political issues raised by state takeover regulation are clearly better analyzed by the *Pike* balancing approach. Indeed, *Edgar, Terry, Fleet* and *Icahn* condemned their respective statutes as both direct and indirect burdens on commerce. In addition, two decisions invalidating state control share acquisition statutes, *Van Dusen, supra,* 622 F.Supp. 1216 and *Dynamics Corp., supra,* 794 F.2d 250 relied exclusively on the *Pike* balancing test.

█ Under *Pike,* the burdens imposed on interstate commerce must not be excessive in relation to the local interests served by the statute. The *Van Dusen* (Minnesota), *Fleet* (Ohio), *Terry* (Hawaii), and *Dynamics Corp.* (Indiana) decisions all acknowledge that control share acquisition acts impair the ability of a potential acquirer to do business with a target company's shareholders. The Minnesota Act as amended still has the net effect of (1) restricting the ability of a designated prospective purchaser (the acquiring person) and any potential selling shareholder (both of whom may be non-citizens of Minnesota) to buy and sell stock and (2) permanently preventing the acquiring person from acquiring stock from a willing seller unless the acquiring person can obtain shareholder approval. Moreover, the Act is not narrowly tailored to protect resident shareholders. *Compare Cardiff, Inc., supra,* 751 F.2d 906 (Minnesota state takeover statute applies only if 20% of all shareholders are Minnesota residents; furthermore, the act's sanctions apply only with respect to tender offers *in* Minnesota).

The underlying policy rationale for perceiving such interference as a "burden" is succinctly outlined as follows:

> Shareholders are deprived of the opportunity to sell their shares at a premium. The reallocation of economic resources to their highest valued use, a process which can improve efficiency and competition, is hindered. The incentive and tender offer mechanism provides incumbent management to perform well so that stock prices remain high is reduced.

*Edgar v. MITE, supra,* 457 U.S. at 643, 102 S.Ct. at 2641 (citations omitted). The Court is well aware of the ongoing debate concerning the merits of this "pure" capital market hypothesis. For example, one commentator notes,

> ... new evidence calls into question the assumption that the existence of stock price increases in corporate takeovers implies efficiency gains in the use of society's resources. If the new evidence is correct, or if it at least raises some doubt as to whether we are sufficiently informed to authoritatively endorse corporate takeovers, then judicial opinions that rely on an efficiency theory of takeovers to analyze the "burden" on interstate commerce of state takeover legislation may be fundamentally flawed.

L. Johnson, Minnesota's Control Share Acquisition Statute and the Need for New Judicial Analysis of State Takeover Legislation, 12 William Mitchell L. Rev. 183, 188–89 (1986). However, this Court declines to be the ultimate arbiter of this economic policy dispute. Instead, the Court feels bound by the strong weight of precedent supporting the position that re-

strictions imposed by acts such as this are burdensome on interstate commerce.

Gelco and the State argue that the burdens are minimal. They argue that the Act does not preclude commencement or consummation of control share acquisitions but instead merely requires shareholder approval. The 1985 and 1986 amendments to the Minnesota Act alleviate some of the most onerous burdens imposed by the other statutes, as well as earlier versions of the Minnesota Act. First, the Minnesota Act as amended neither disqualifies "interested" shares from the shareholder approval vote, *e.g. Terry, supra,* Fed.Sec.L.Rep. at 94,115, nor requires "two-tier" voting (first, whether the acquirer can have voting rights, and second whether the acquisition will be approved). *See, e.g. Fleet, supra,* 637 F.Supp. at 753; *Dynamics, supra,* 794 F.2d at 261. Second, under the Minnesota Act as amended in 1985 (*after* Judge Rosenbaum's *Van Dusen* decision), the shareholder approval vote must occur within 20 business days after receipt of the acquirer's required disclosures. *Compare Dynamics, supra,* 794 F.2d at 261 (Indiana statute, 50 days); *Terry, supra,* 643 F.Supp. 161, Fed.Sec.L.Rep. at 94,115 (Hawaii statute, no deadline); *Fleet, supra,* 637 F.Supp. at 753 (Ohio statute, 50 days).

These reductions in the "burden" do not save the Minnesota statute. Admittedly, the Minnesota statute is more democratic because it eliminates two-tier voting and/or disqualification of the acquirer's shares. But in the context of shareholders facing a choice between an outside acquirer's offer which is subject to the Act's disclosure and shareholder approval rules, and a management self-tender which is exempted, the voting requirement has an extremely coercive effect. For example, in the Gelco battle, even if Coniston had tried to comply with the Control Share Act, current shareholders would be faced with a difficult dilemma: tender pursuant to the Company's Exchange Offer which closes on November 10, or risk missing any opportunity to tender their shares by waiting for shareholder approval of Coniston's offer which may or may not occur. The fact that under federal law, Coniston could not have begun purchasing shares until the twentieth business day following commencement of their offer, 17 C.F.R. 240.14e–1(a), does not mitigate the coerciveness of the state regulation. For, absent the Control Share Act, shareholders would not have to gamble on whether Coniston's offer would be consummated contingent on a future majority shareholder vote.

*Fleet, Dynamics, Terry* and *Van Dusen* were especially critical of the time delays posed by the respective control share acts they examined. However, the fact that the deadline for the shareholder approval vote is now identical with the federal securities law time frame for when purchases under a tender offer may begin does not necessarily eliminate all possibility of delay. Notwithstanding the promise by Gelco at the hearing that it will schedule a vote as promptly as possible, in many cases incumbent management can be expected to schedule the vote at the end of the twenty day period. Delay in the vote count and/or challenge of proxies, or delay in receiving mailed proxies, could easily prevent the acquirer from beginning to make purchases at 12 midnight of the twenty-first business day, as allowed by federal law. Moreover, there is arguably a burden in the added expense of not only pursuing a tender offer but also running the gauntlet of a proxy contest. *See Fleet,* 637 F.Supp. at 758.

Gelco and the State suggest that the burdens imposed by the Act are justifiable as a constitutional exercise of Minnesota's power to regulate a domestic corporation's internal affairs and to protect both resident and nonresident shareholders of a Minnesota corporation. Having determined that control of a corporation is a corporate asset, the sale of which profoundly affects internal corporate affairs, the State argues regulation is appropriate just as it is for mergers, exchanges of shares, and the sale of all or substantially all of the company's assets.

The analogy is not persuasive. The Control Share Acquisition Act regulates share-

holders. In contrast, the merger requirements, and other "internal corporate affairs" rules, control acts by corporate entities. *See Edgar, supra,* 457 U.S. at 645, 102 S.Ct. at 2642 ("[t]ender offers contemplate transfers of stock by shareholders to a third party and do not themselves implicate the internal affairs of the target company"); *Fleet, supra,* 637 F.Supp. at 762 (the distinction between a tender offer to purchase shares and a decision by a board of directors and stockholders to change a corporate form is "so fundamental that it cannot be disregarded"); *Van Dusen, supra,* 622 F.Supp. at 1224 (the "merger analogy perpetuates the state's confusion between regulation of a corporation and the regulation of those who would trade in shares ... [the Control Share Acquisition Act] does not purport to regulate the activities of the corporation; rather, it reaches out and regulates *shareholders* who may or may not be residents of Minnesota.")(emphasis in original).

Gelco and the State further argue that in the context of a tender offer such as Coniston's, conditioned on acquiring a majority of the shares, the Act's requirement of majority approval is no burden. If a majority of Gelco shareholders would opt to sell, the argument goes, a majority would vote approval. This argument is fundamentally flawed because it ignores the possibility that Coniston could opt for less than majority control; yet, a majority approval vote would still be required.

Balanced against the burdens discussed above are a number of alleged benefits. First, Gelco and the State assert that the Act extends principles of corporate democracy to all shareholders, resident and nonresident. But the benefit conferred on nonresident shareholders is only relevant if we accept Gelco's and the State's merger analogy—which the Court does not for the reasons noted above.

Having concluded that the Act is not justifiable as consistent with the state's traditional responsibility to regulate the corporation's internal affairs, there is no justification for the protection allegedly offered local residents. After all, the Act purports to protect local investors but applies regardless of whether Minnesota residents are involved. This same flaw led the courts in *Edgar, Terry, Fleet, Dynamics* and *Van Dusen,* to ignore this alleged benefit. And, it is this same flaw which distinguishes the Act from its legislative cousin, the Minnesota Corporate Take-Over Act, approved by the 8th Circuit in *Cardiff, Inc., supra,* 751 F.2d at 911.

The State contends that the Act protects investors from potentially coercive control share acquisition bids. In such situations, shareholders may sell their stock even though opposed to a change in control, simply because they fear that the proposed acquisition will succeed, to the detriment of their company. Given a "collective opportunity" to decide the appropriateness of the control share acquisition, the State argues, this "coercion" can be eliminated. First, the Court notes that the Act creates its own coercion. In the context of competing self-tender and outsider offers, the uncertainty of whether the outside offer will be approved by a majority—a decision that may not occur until after the self-tender closes—may coerce shareholders to tender to the only "sure" offer. Second, actual shareholder democracy is better served by letting each shareholder decide independently whether to tender his or her shares.[9] *See e.g. Fleet, supra,* 637 F.Supp. at 758.

Gelco and the State assert that the Act protects Minnesota's business climate by encouraging investment and incorporation in the state—both because outside acquir-

---

9. The Court notes in this regard, that there is considerable difference between a corporation's adoption of defensive tactics, which some may say are anti-democratic if not approved by shareholder vote, and the state-imposed defensive tactic created by the Act here in question. Corporate officers are subject to fiduciary duties in their imposition of defensive tactics. The state, of course, if not. *Dynamics Corp. of America v. CTS Corp.,* 637 F.Supp. 389, 399 (N.D.Ill.1986) ("when state law authorizes the defensive maneuver ... [the] check on managerial self-interest is absent"), *aff'd,* 794 F.2d 250.

ers are more likely to relocate out-of-state or liquidate a company's assets and because of the benefits of shareholder democracy.

The economic dislocation argument is weakened by the fact that the Act does not place similar restrictions on incumbent management's self-tenders, even though current management is just as capable of moving out-of-state or liquidating assets. *See Van Dusen, supra,* 622 F.Supp. at 1223, *citing Edgar, supra,* 457 U.S. at 644, 102 S.Ct. at 2641; *Fleet, supra,* 637 F.Supp. at 764. The shareholder democracy argument is rejected for the reasons noted above.

■ On balance, the Court believes that the burdens imposed on interstate commerce are excessive in relation to the local benefits served by the Act so as to create an impermissible indirect burden on interstate commerce. So concluding, there is no absolute need to reach the Supremacy Clause issues extensively briefed by all of the parties. However, the Court is also well aware that the parties will appeal this decision. Should the Court of Appeals reverse this decision, it would in all likelihood remand for resolution of the Supremacy Clause issues. Therefore, the Court has decided to rule on alternative grounds so as to provide a record whereby the entire controversy can expeditiously continue on appeal. *See e.g. Dynamics Corp., supra,* 637 F.Supp. at 400.

## THE SUPREMACY CLAUSE

The Supremacy Clause of the U.S. Constitution provides, "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land ..., *any Thing* in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. Art. VI, cl. 2.

Coniston contends that the Control Share Act is preempted by the Williams Act, 15 U.S.C. §§ 78m(d)–(e), 78n(d)–(f), because it 1) conflicts directly with the federal law by preventing shareholders from purchasing additional shares at any time; 2) requires

disclosures not necessary under federal law; and 3) discriminates in favor of management, which is not subject to the disclosure and shareholder approval requirements.

■ Significantly, Congress did not explicitly prohibit state regulation of takeovers when it added the Williams Act to the Securities Exchange Act of 1934. Congress specifically declined to amend section 28(a) of the 1934 Act, 15 U.S.C. § 78bb(a). In pertinent part, section 28(a) provides that

> [n]othing in this chapter shall affect the jurisdiction of the securities commission (or any agency or officer performing like functions) of any State over any security or any person insofar as it does not conflict with the provisions of this chapter or the rules and regulations thereunder.

Thus, whether preemption applies is for the Court to decide. *Cardiff, Inc., supra,* 751 F.2d at 913; *Edgar v. MITE, supra,* 457 U.S. at 631, 102 S.Ct. at 2634.

The Williams Act was enacted by Congress in 1968 to "insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information...." *Piper v. Chris-Craft Industries,* 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977). The Act, *inter alia,* requires offerors to disclose certain information to the SEC, the shareholders of the target company and the target company, and requires that a tender offer remain open for not less than twenty business days. 17 C.F.R. § 240.14e–1(a). In the words of the 7th Circuit, the Williams Act "essentially just requires the filing of a public statement of intentions and giving the shareholders enough time to digest the information as well as such counterinformation as management may care to supply." *Dynamics Corp., supra,* 794 F.2d at 262.

The Williams Act is drafted to avoid "tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid." H.R.

Rep. No. 1711, 90th Cong., 2d Sess., reprinted in 1968 U.S.Code Cong. & Ad. News 2811.

■ The Court finds that the Act's disclosure requirements themselves are not sufficiently in conflict with those of the Williams Act to justify invalidating the Act on preemption grounds. The Control Share Acquisition Act disclosure requirements closely parallel those of the Minnesota Take-Over Act which withstood a Supremacy Clause challenge in *Cardiff, Inc., supra,* 751 F.2d at 914.

Central to all of the decisions invalidating analogous control share statutes under the Supremacy Clause was the lengthy delay allowed by incumbent management's option to schedule a shareholder approval vote up to 50 days after filing of required disclosures. *See e.g. Dynamics Corp.,* 794 F.2d at 263 ("if the Williams Act is to be taken as a congressional determination that a month (roughly) is enough time to force a tender offer to be kept open, 50 days is too much"). Such drastic delays are eliminated from the amended version of the Minnesota Act. The act, as amended, requires that the shareholder approval meeting he beheld within twenty business day after receipt of the disclosure information statement.

However, as noted *infra* at page 841, the fact that the deadline for the shareholder approval vote is not identical with the federal securities law time frame for when purchases under a tender offer may begin does not necessarily eliminate the possibility of burdensome delay.

More importantly, even absent significant time delays or conflicts in the disclosure requirements, the Court is troubled by the simple fact that the Control Share Act requires shareholder approval of certain tenders and not others. This in effect converts a tender offer into a proxy contest— with additional expense and potential for delay. *See Fleet, supra,* 637 F.Supp. at 758. There is a vast difference between requiring disclosure of information to allow investors to make informed decisions and requiring a vote using that information. The Williams Act requires the former. The

Minnesota Act goes considerably further by requiring both.

■ This Court holds that by depriving individual shareholders of the right to make independent decisions regarding offers to sell, there is conflict with the Williams Act objective to "get information to the investor by allowing both the offeror and the incumbent managers of a target company to present fully their arguments and then let the investor decide for himself." *Great Western United Corp. v. Kidwell,* 577 F.2d 1256, 1276 (5th Cir.1978), *rev'd on other grounds sub nom. Leroy v. Great Western United Corp.,* 443 U.S. 173, 99 S.Ct. 829, 61 L.Ed.2d 464 (1979). *See also Edgar v. MITE, supra* 457 U.S. at 639, 102 S.Ct. at 2639. Accordingly, the Act runs afoul of the Supremacy Clause.

## CONISTON'S REQUESTS FOR PRELIMINARY INJUNCTIVE RELIEF

Consiton's requests for preliminary injunctive relief must be evaluated by the standard articulated in *Dataphase Systems, Inc. v. C L Systems, Inc.,* 640 F.2d 109, 113 (8th Cir.1981).

Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

■ If the Exchange Offer closes and Merrill Lynch is permitted to exercise rights over the Series 2 Preferred Shares, Coniston claims it will be irreparably harmed because of its inability to proceed with its plan to obtain control of Gelco. The Court disagrees. First, it is by no means clear that Coniston will be forever precluded from obtaining control. Second, the loss of Coniston's current bid is primarily a loss of prospective profit. The record shows that Coniston does not intend to operate Gelco, rather it intends to buy Gelco for liquidation purposes. If the injunc-

tion is denied, Coniston could prove at trial the difference between the lost liquidation potential and the cost of its bid. *See e.g. FMC Corp. v. R.P. Scherer Corp.*, 545 F.Supp. 318, 322 (D.Del.1982) ("inasmuch as an adequate remedy at law is available to correct the harm alleged the equitable relief requested would be inappropriate").

Balancing Coniston's allegations of injury are Gelco's assertions that delaying its Exchange Offer or enjoining other aspects of its restructuring plan would jeopardize relations with lenders and make difficult planned acquisitions designed to improve the Company's competitive position. Gelco also alleges potential disruption of customer and employee relations.

Coniston vigorously argues that the public interest is best served by enjoining the Exchange Offer so that Gelco shareholders can make a free and "uncoerced" choice as to which offer to tender their shares. The argument is compelling. However, the Court questions whether it is truly in the public interest to allow Coniston's cash bid to force an auction of a company in the midst of a pre-existing restructuring plan to boost shareholders' stock value.

■ On balance, none of these factors seem decisive. The matter turns on this Court's perception of Coniston's low probability of success on the merits.

■ Under Minnesota law, there is a strong presumption protecting a director's business decision. *See Westgor v. Grimm*, 318 N.W.2d 56, 58–59 (Minn.1982); *In re Hedberg-Friedheim & Co.*, 233 Minn. 534, 47 N.W.2d 424, 428 (1951). However, the current trend is to refine this traditional business judgment rule in the corporate control context. *See* Herbert S. Wander and Alain G. LeCoque, "Corporate Control Transactions and Today's Business Judgment Rule," 42 Bus. Law. 29, 31 (November 1986). Instead, there is an "enhanced duty" of loyalty which calls for heightened judicial scrutiny even of the conduct of disinterested directors represented by independent advisors. *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d

173, 181 (Del.1986); *Unocol Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954–55 (Del. 1985) (enhanced scrutiny demanded by the "omnipresent specter that a board may be acting primarily in its own interests, rather than those of the corporation and its shareholders").

■ Giving Coniston the benefit of the doubt, the Court views the adoption of the Poison Pill, and the decisions to conduct a self-tender and to sell preferred stock to Merrill Lynch, as defensive tactics subject to heightened scrutiny.

■ Accordingly, in evaluating the Gelco Board's actions, the initial burden falls on the Gelco directors to show: (1) that they had reasonable grounds for believing that a danger to corporate policy and effectiveness existed; and (2) that the defensive measures adopted were reasonable in relation to the threat shown. *Moran v. Household Intern, Inc.*, 500 A.2d 1346, 1356 (Del. 1985), *citing Unocol, supra*, 493 A.2d at 954–55.

■ The first part of the burden is satisfied by a showing of good faith and reasonable investigation. *Id.* at 955, *citing Cheff v. Mathes*, 199 A.2d 548, 554–55 (Del. 1964). The ability of the Gelco Board to justify its strategic decisions as reasonable in relation to the threat shown is materially enhanced by the fact that a majority of its members are outside, independent directors. *Moran, supra*, 500 A.2d at 1356. Moreover, the Gelco directors are subject to less extensive judicial review because their decisions to adopt the Poison Pill, implement a restructuring plan, conduct a self tender and sell preferred stock to Merrill Lynch were made before Coniston made a bid for corporate control. *Id.* at 1353.

■ In any event, the ultimate burden remains on Coniston to show a breach of the director's fiduciary duties. *Unocol, supra*, 493 A.2d at 958. Coniston has failed to meet this burden.

1. *The Exchange Offer*

■ Coniston contends that the Gelco Exchange Offer is structured to coerce

shareholders into tendering by offering to purchase a limited number of shares, and leaving shares that are not tendered as part of a minority position having an uncertain and far lower value in the market— effectively converting a public shareholder majority into a minority position in the company. Coniston further argues that the Exchange Offer is an unjustifiable response to its own competing all-cash offer and a breach of the Gelco directors' fiduciary duties.

Coniston relies heavily, and to its detriment, on a recent Delaware Chancery Court decision, *AC Acquisitions Corp. v. Anderson, Clayton & Co.*, 519 A.2d 103 (Del.Ch.1986). In *AC Acquisitions*, Bear Stearns made a hostile tender offer at $56 per share in cash, conditioned on acquiring 51% of Anderson, Clayton & Co. ("Anderson Clayton") stock. The next day, Anderson, Clayton's board instituted a tender offer for up to 8 million shares of the company's stock at $60 per share, which was timed to close after Bear Stearns' offer closed. The court concluded that in the face of a competing all-cash "hostile" offer for all shares, the company's self-tender was coercive; even shareholders who preferred the competing all-cash tender offer could not risk not tendering into the company's self-tender. As a result, the court issued an injunction which enjoined the company's self-tender until after the "hostile" all-cash offer had closed.

Admittedly, the Exchange Offer's dutch auction structure has a similar coercive effect in that shareholders may feel obligated to tender to Gelco's offer for fear their shares will decrease in value if not tendered. But the similarities between the case end there.

Significantly, there was no finding by Anderson, Clayton's investment banker that the hostile offer was inadequate. In comparison, Gelco's investment banker specifically advised that Coniston's $26 offer was inadequate from a financial point of view; the Gelco Board in good faith determined that their own restructuring program promised greater long term value for shareholders than the sale to Coniston. This calculation appears reasonable given that Gelco's investment advisors estimated the breakup value of the Company to be in the range of $29.85 to $37.86 per share (preliminary analysis) or $31.57 to $39.03 per share (final analysis). Obviously, to the extent the Board rejects a potential acquirer's all-cash offer closer to these ranges, the judgment of the Board becomes suspect.

The Anderson, Clayton self-tender had no underlying business purpose other than to react to the hostile offer. The Gelco Exchange Offer, in comparison, was not "unmistakenly reactive" to either of Coniston's bids. *Id.* at 114.[10] Instead, the Exchange Offer was part of the restructuring plan adopted almost a full month *prior* to Coniston's initial September 25, 1986 proposal to negotiate a merger at $22.50 per share. And, in any event, the Exchange Offer itself was in place several weeks *prior* to the commencement of Coniston's pending offer.

That the "blended value" of Coniston's offer is several dollars higher than the Exchange Offer does not prove that Coniston's bid is adequate. The Exchange Offer is intended to give stockholders a choice between liquidating their holdings now and still holding a stake in the future growth or maintaining their current investment position, or a mix of both. The Board specifically refused to recommend that shareholders tender at the Exchange Price. Moreover, none of Gelco's executive officers or directors intend to tender into the Exchange Offer.

The Court does not agree with Coniston's assessment that going forward with the Exchange Offer and the sale of preferred stock to Merrill Lynch constitutes an irreversible shift of control of the company. For one thing, an issuing corporation does

---

**10.** This is not to say that the terms of the pending Exchange Offer were not affected by Coniston's initial $22.50 cash bid. Afterall, Gelco's initial self-tender was cancelled precisely because Coniston's bid boosted the value of Gelco stock beyond the range of the self-tender.

not have a control interest in itself. Thus, the Exchange Offer, with its resulting increase in treasury stock, does not change Gelco's control of itself. It is true that if the Exchange Offer goes forward and Merrill Lynch exercises its voting rights, Gelco management and directors, together with Merrill Lynch, will control 53% of the voting power of the company. But the preferred stock held by Merrill Lynch can be redeemed at any time, and in all likelihood *will* be redeemed in the relatively near future. In the meantime, Merrill Lynch is not bound to vote a particular way.

Coniston suggests that merely because it made an all-cash offer, the Gelco Board must assume the role of auctioneer, with the responsibility of obtaining the highest price for shareholders to the exclusion of any other factors. This position is simply not supported by the case law. *Smith v. Van Gorkom,* 488 A.2d 858, 875 (Del.1985) (offer of premium over market value does not always justify a merger). *See also Crouse-Hinds Co. v. Internorth, Inc.,* 634 F.2d 690 (2d Cir.1980); *Turner Broadcasting System v. CBS,* 627 F.Supp. 901, 908 (N.D.Ga.1985). However, to the extent the bidding war continues, with offers steadily increasing in value, the transition from corporate defender to auctioneer becomes inevitable. *Revlon, Inc., supra,* 506 A.2d at 181–82.

## 2. *The Rights Plan*

Reduced to a single statement, the Poison Pill provides that, unless Gelco redeems the created Rights, a Right Holder—excluding the acquiring person—can purchase $126 worth of Gelco stock for $63 in the event of a hostile tender. Thus, argues Coniston, no party will attempt to merge or otherwise combine with Gelco unless it receives prior approval, even if the party, as here, is willing to pay all cash for all outstanding shares. Moreover, in the event of a merger where Gelco is not a surviving company, the Rights plan gives current Gelco stockholders the right to purchase stock of the acquiring company for half of its fair market value—arguably depressing the market value of the acquiring company's stock on the open market.

Coniston attacks adoption of the Poison Pill as an *ultra vires* act because the plan impermissibly discriminates between shareholders of the same class of stock, poses an unreasonable restraint on the right of certain shareholders to transfer their rights and illegally fails to require that fair consideration be paid for all Gelco common stock. Coniston further asserts that the Board breached their fiduciary duties in adopting the Rights Plan and in failing to redeem it in lieu of Coniston's all-cash tender offer. Each argument will be examined in turn.

### A. *Ultra Vires*

Coniston contends that Minnesota corporate law, Minn.Stat. § 302A.401, precludes corporations from discriminating against shareholders within a particular class of stock. The Poison Pill, argues Coniston, specifically authorizes such discrimination because, once triggered, the Plan allows holders of common stock to exercise the rights and purchase stock at half its market value, while at the same time declaring such rights null and void for 20% or greater stockholders. The Court does not agree that Section 302A.401, subd. 2(b) forbids this type of discrimination.

Section 302A.401, subd. 2(b) provides that all shares of the corporation:

shall be common shares entitled to vote and shall have equal rights and preferences in all matters not otherwise provided for by the board, unless and to the extent that the articles [of incorporation] have fixed the relative rights and preferences of different classes and series....

The statute appears to contemplate that a board of directors may authorize differing rights and preferences with respect to a class of stock. The comment to § 302A.401 notes:

[i]f the articles are silent with respect to one or more particular rights or preferences, *the board may fix those rights and preferences.* In the absence of all such provisions in the articles or any

board action fixing the rights and preferences, and all shares will be voting shares, each having one vote.

20 Minn.Stat.Anno. at pg. 413 (1985) (emphasis added). A board's discretion under the section seems particularly broad. Additional commentary provides:

[t]he capital structure is ordinarily a matter within the discretion of the board, since it may be necessary to issue shares with various rights without excessive statutory restrictions by this act.

*Id.*

Coniston points to two provisions of Gelco's Articles of Incorporation which purportedly limit the power of the Board to adopt the Rights Plan. First, the articles do state "[t]he holders of Common Shares shall have and possess all rights as stockholders of the corporation except as such rights may be limited by the preferences, rights, limitations and restrictions of the Class A Preferred Shares and the Class B Preferred Shares." However, this provision merely governs the relationship between common stockholders and preferred stockholders. It does not impose a limitation on differentiating between common stockholders. Second, Coniston notes that the Articles state "each share of each series shall be identical in all respects with other shares of such series." Coniston does not make clear from where this quote was abstracted. The only place this Court found the language was in a section governing the relationship of Class A and Class B Preferred Shares. Again, the restriction is not controlling with respect to common shares.

Minnesota courts have not yet addressed this issue. The case law from other jurisdictions is not uniform. Two recent decisions applying New Jersey law invalidated Rights Plans on discrimination grounds. See *Amalgamated Sugar C. v NL Industries,* 644 F.Supp. 1229 (S.D.N.Y.1986); *As-*

*arco Inc. v. Court,* 611 F.Supp. 468 (D.N.J. 1985). However, Delaware corporate law, upon which both parties rely heavily in their briefs, permits discrimination in rights within a single class of stock. *See Providence & Worcester Co. v. Baker,* 378 A.2d 121 (Del.1977) (non-uniform voting rights permitted for shares of stock in the same class).

Case law also conflicts with respect to Coniston's assertion that the Rights Plan unreasonably restrains the right of an acquiring person to transfer their Rights.[11] *See Moran v. Household International, Inc.,* 490 A.2d 1059, 1079 (Del.Ch.) *aff'd,* 500 A.2d 1346 (Del.1985) (explicitly rejecting the restraint on alienation argument having concluded that the "[r]ights Plan [did] not affect the trading of Household shares or the registration of shares once traded"). *But compare Amagamated Sugar Co. v. NL Industries, supra,* 644 F.Supp. at 1263 (an acquiring person who receives certificates with a legend warning that the rights may be void "ha[d] received something which in all probability could under no circumstances be transferred"); *Ministar Acquiring Corp. v. AMF, Inc.,* 621 F.Supp. 1252, 1258 (D.C.N.Y.1985).

The Minnesota statutory provision governing restrictions on the transfer of shares, section 302A.429, is based upon Delaware Corporation Law, Section 202 (1986). The Court concludes that the Delaware precedent is controlling. *See* Section 302A.429 Commentary at pg. 462.

Finally, Coniston claims that the Rights Plan runs afoul of Minn.Stat. § 302A.405 because the Plan does not require fair consideration to be paid for the common stock which can be purchased using the rights. Section 302A.405 provides:

[T]he determination of the board ... as to the ... fairness to the corporation of

---

**11.** Section 4 of the Rights Plan provides that Acquiring Persons' rights certificates bear the following legend:

The Rights represented by this Rights Certificate were issued to a Person who was an Acquiring Person or an Affiliate or an Associ-

ate of an Acquiring Person. This Rights Certificate and then Rights represented hereby may become void to the extent provided by, and under certain circumstances as specified in, Section 7(e) of the Rights Agreement. Freilich Affidavit, Exhibit B.

the consideration ... to be received by the corporation for its shares ... are presumed to be proper if they are made in good faith and on the basis of accounting methods, or a fair valuation or other method, reasonable in the circumstances.... Directors ... who without reasonable investigation, fail to vote against approving an issue of shares for a consideration that is unfair to the corporation ... are jointly and severally liable to the corporation for the benefit of the ... Shareholders ... who are damaged by the action....

Again, Gelco has the better of the argument. The record shows that management specifically considered the reasonability of the exercise price of $63 as a reflection of the inherent value of the Company. This good faith judgment was certainly reasonable under the circumstances.

This Court is the first to admit that the considerable time pressures under which it has conducted review of these matters has foreclosed the careful deliberation that is necessary for definitive evaluation of these novel state law issues. Thus, the Court is far from confident in its conclusions. At the same time, the Court is satisfied that on the present record, Coniston has failed to carry its burden to convince this Court of any substantial likelihood of success on the merits of these claims.

### B. *Breach of Fiduciary Duties*

■ As a starting point, Poison Pills are not a *per se* invalid defensive tactic. *See Moran v. Household International, Inc.*, *supra*, 500 A.2d 1346. In *Moran*, the Delaware Supreme Court held that directors' adoption of a preferred share purchase rights plan was a legitimate exercise of business judgment.

Central to the *Moran* decision was the court's determination that the plan was not adopted in response to a specific threat but instead adopted to ward off possible future advances. This is exactly what occurred here; Gelco adopted the plan some four months prior to Coniston's hostile bid. The *Moran* court also placed much emphasis on

the fact that the plan would not deter all hostile tender offers. The same can be said of Gelco's Rights Plan.

In *Moran,* the court suggested that there were several methods to overcome the plan and make a successful tender, including:

tendering with a condition that the Board redeem the Rights, tendering with a high minimum condition of shares and Rights, tendering and soliciting consents to remove the Board and redeem the Rights, [and] acquiring 50% of the shares and causing [the company] to self-tender for the Rights. One could also form a group of up to 19.9% and solicit proxies for consents to remove the Board and redeem the Rights.

*Moran,* 500 A.2d 1354. At least some of these options appear possible under Gelco's plan.

The *Moran* court also emphasized that the Poison Pill was not inherently coercive because shareholders would always be protected because the directors would be subject to regular fiduciary duties in deciding whether or not to exercise discretion and redeem the Rights as part of an acceptable outside tender. Such protection was not abused in the present case.

■ Directors have not only the right, but a duty, to adopt defensive measures to defeat a takeover attempt contrary to the best interests of the corporation and its shareholders. *MacAndrews & Forbes Holdings, Inc. v. Revlon, Inc.,* 501 A.2d 1239, 1247 (Del.Ch.), *aff'd,* 506 A.2d 173 (Del.1985). The Gelco Board devoted a five and one half hour meeting to evaluating the merits of the Coniston proposal, including the issue of whether to redeem the Rights Plan in lieu of the offer. The Board's refusal to redeem the Rights Plan was clearly a reasonable response to the hostile bid, which the Board, partially based on advise from its investment banker, concluded was inadequate from a financial point of view.

■ The mere fact that the Coniston bid represented a premium above prevailing market values is not alone sufficient to

require a merger. *See e.g. Smith v. Van Gorkom, supra,* 488 A.2d at 875–76. Gelco management reasonably concluded that current market values are not reflective of the company's intrinsic worth especially in lieu of anticipated benefits of the restructuring program.

█ Moreover, the Board rightfully considered factors other than price. Reasonableness of a decision involving defensive tactics may properly involve numerous concerns, including: "nature and timing of the offer, questions of illegality, the impact on 'constituencies' other than shareholders (i.e. creditors, customers, employees, and perhaps even the community generally), the risk of nonconsummation, and the quality of securities being offered in the exchange." *Unocol, supra,* 493 A.2d at 955.

█ In addition to the Board's confidence that the restructuring program would yield superior long term benefits for its shareholders, the Board was also understandably, and reasonably, concerned by Coniston's reputation as a raider, uninterested in continued operation of the Company. Given these concerns, keeping the Rights Plan in place was a reasonable course of action.

### 3. *Sale of Preferred Stock to Merrill Lynch*

Coniston contends that Gelco directors breached their fiduciary duties by selling the preferred shares to Merrill Lynch even though Coniston had offered to purchase the same shares on terms more favorable to Gelco shareholders. Coniston also contends that Gelco sold the shares with an invalid purpose—solely to preclude third party tender offers.

The record suggests that Coniston indeed offered a higher price for the same series of preferred stock. But the record also shows that Coniston was not willing to agree to the same stand-still provisions acceptable to Merrill Lynch. Thus, Coniston's bid for purchase of the shares did not fit into the pre-established plan for the stock.

█ Gelco does not deny that one purpose of the transaction was to place a significant block of stock in friendly hands. But that was not its only purpose. The sale was also an attractive form of "bridge financing" unavailable from Gelco's regular lenders. This independent and credible business purpose cuts strongly in Gelco's favor. *See Gearhart Industries v. Smith International,* 741 F.2d 707, 722–23 (5th Cir.1984).

█ Furthermore, it cannot be overemphasized that the original decision to approve the sale was in late August, a full month prior to Coniston's initial bid for control. To the extent the sale is considered a defensive tactic, such pre-planning is preferred over reactive measures. *See e.g. Moran, supra,* 500 A.2d at 1350.

Based on the foregoing, IT IS HEREBY ORDERED that the Minnesota Control Share Acquisition Act, Minn.Stat. § 302A.671, is facially invalid as a violation of the Commerce and Supremacy Clauses of the United States Constitution.

IT IS FURTHER ORDERED that pursuant to Fed.R.Civ.P. 65(a)(2), Counterclaim-defendants, and all persons acting in concert with them, are permanently enjoined from taking any action to enforce or apply provisions of the Minnesota Control Share Acquisition Act, to, against, or with respect to Counterclaimants' pending tender offer for Gelco shares.

IT IS FURTHER ORDERED that Counterclaimants' motion for a preliminary injunction to enjoin the purchase by Gelco of any shares of Gelco common stock pursuant to the Exchange Offer announced by Gelco on October 7, 1986 is denied.

IT IS FURTHER ORDERED that Counterclaimants' motion for a preliminary injunction to enjoin Gelco from using the cash proceeds from the sale of Gelco preferred stock to Merrill, Lynch & Co. is denied.

IT IS FURTHER ORDERED that Counterclaimants' motion for a preliminary injunction voiding any voting or conversion

rights attendant to the preferred stock issued to Merrill Lynch is denied.

IT IS FURTHER ORDERED that Counterclaimants' motion for a preliminary injunction to enjoin enforceability of Gelco's Preferred Stock Purchase Rights Plan is denied.

IT IS FURTHER ORDERED that Counterclaimants' motion for a preliminary injunction directing defendant directors of Gelco to redeem, rescind or amend Gelco's Preferred Stock Purchase Rights Plan so as to make it inapplicable to Counterclaimants' tender offer is denied.